**STATE of Indiana, Appellant,**

v.

**Ray A. GARCIA, Appellee.**

**No. 32S01–8611–CR–987.**

Supreme Court of Indiana.

Nov. 20, 1986.

 

Linley E. Pearson, Atty. Gen., Lee Cloyd, Deputy Atty. Gen., Indianapolis, for appellant.

Robert W. Freese, Elmendorf, Meyer & Freese, Brownsburg, for appellee.

PIVARNIK, Justice.

This cause comes to us on a criminal petition to transfer from the First District Court of Appeals. Petition is brought by Appellee, Ray A. Garcia. The Hendricks Superior Court, No. 2, granted Appellee's motion to suppress evidence of driving while intoxicated obtained at a roadblock in Hendricks County. The State of Indiana appealed the trial court's order to suppress. *State v. Garcia* (1985), Ind.App., 481 N.E.2d 148. The Court of Appeals, First District, reversed, holding the roadblock procedures used were constitutional. Appellee petitions this Court to transfer. We now grant Appellee's Petition to Transfer, however, fully agreeing with the holding of the Court of Appeals. We grant transfer for the purposes of addressing an issue in need of clarification and to resolve an apparent conflict created between *State v. Garcia, supra,* and *State v. McLaughlin* (1984), Ind.App., 471 N.E.2d 1125, *trans. denied.*

The sole issue addressed herein is whether the Hendricks County roadblock procedures violated Appellee's Fourth Amendment right against unreasonable searches and seizures such that evidence obtained pursuant to the procedures should have been suppressed.

The pertinent facts of this case were well summarized by the Court of Appeals as follows:

"The Indiana State Police, pursuant to a state-wide program in cooperation with the Hendricks County Sheriff's Department, conducted a roadblock on U.S. 40, two and one-half miles east of Plainfield in Hendricks County. The purpose of the roadblock was to check for improperly licensed operators, improperly registered automobiles, under-age drinking, and persons driving while intoxicated. The State Police released prior publicity

in various newspapers concerning the general plan to conduct roadblocks, but not of roadblocks in any specific location. The particular spot at issue was selected by Officer James B. Cramer, Supervisor of the Indiana State Police in Hendricks County, and Lt. Daniel Williams of the Hendricks County Sheriff's Department. Their decision was based upon information obtained from State Police records which reflected that this location in the road generated numerous fatal and non-fatal accidents involving alcohol, including an incident where a deputy sheriff was struck by a drunk driver while supervising a wreck. The roadblock was implemented in accordance with a pre-arranged plan generated by Marion County and Morgan County, which was adopted by the Indiana State Police Department. The plan was developed in accordance with recent Supreme Court decisions.

Pursuant to the plan, the westbound traffic on U.S. 40 was stopped by approximately 11 uniformed officers who were visible on the highway. They blocked off the left westbound lane whereby all traffic was funneled into the right westbound lane, using flares and the lights from police cars to identify the roadblock. Non-selectively, cars were stopped in consecutive groups of five. Absent the detection of drinking or other violations, drivers were detained for no more than two or three minutes, during which time other traffic was permitted to pass. After a group of five was inspected and released, the next group of five cars traveling west was brought in, and the procedure was repeated. The drivers of the stopped cars were asked to produce operators licenses and registration certificates. If a violation was suspected, or alcohol consumption was detected, such operator was pulled over into a restaurant and motel parking lot. As relevant here, a driver suspected of alcohol consumption was given a field blood alcohol test. Any driver found to be over the presumptive limit of .10 blood alcohol content was then taken to the Hendricks County Jail where a breatha-lyzer test was administered. Upon failure of this second test, the operator was arrested. The berm near the roadblock was adequate for safety purposes, the area was lighted, and the roadblock was visible for a considerable distance. Additionally, the officers at the roadblock had absolutely no latitude or discretion to depart from the procedure set out in the plan. Numerous motorists, upon sighting the roadblock, turned their vehicles around and fled.

Garcia, who exhibited no erratic or suspicious driving, was in the first group of five cars stopped. He could produce no operator's license, whereupon an officer who was present recognized him and stated Garcia's operator's license had been suspended. After detecting alcohol on Garcia's breath, the officer read him an implied consent statement. Garcia agreed to take a field test, which he failed. Upon his subsequent failure of a breathalyzer test, Garcia was arrested. He was charged with his second offense of driving while intoxicated.

The roadblock was maintained for two hours. During this time, the officers stopped approximately 100 cars, issued 20 citations, and arrested seven persons for driving while intoxicated."

*State v. Garcia*, 481 N.E.2d 149–150.

The United States Supreme Court has most recently decided the following cases providing guidance as to the constitutionality of roadblock stops of vehicles: *Brown v. Texas* (1979) 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (random stop-and-identify statute held unconstitutional); *Delaware v. Prouse* (1979) 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (random and discretionary stops made to check for license and vehicle registration held unconstitutional); *United States v. Martinez-Fuerte* (1976), 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (permanent roadblock checking for illegal aliens from Mexico held constitutionally valid); *United States v. Brignoni-Ponce* (1975), 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (random stops of vehicles near Mexican border to detect entry of illegal aliens held

unconstitutional). These cases have set forth limitations on the police when maintaining roadblocks. However, the United States Supreme Court explicitly recognized that roadblocks may be conducted in a constitutional manner for checking for driving violations in *Prouse, supra*. In *Prouse*, the Court struck down a random, discretionary stop made to check for vehicle license and registration, but stated:

"This holding does not preclude the . . . States from developing methods for spot checks that involve less intrusion or that do not involve the unconstrained exercise of discretion. Questioning of all oncoming traffic at roadblock-type stops is *one* possible alternative. We hold only that persons in automobiles on public roadways may not for that [license and registration checks] reason alone have their travel and privacy interfered with *at the unbridled discretion of police officers*." (emphasis added).

*Prouse*, 440 U.S. at 663, 99 S.Ct. at 1401, 59 L.Ed.2d at 673. Thus, in *Prouse* not only did the United States Supreme Court recognize the legitimacy of the State's concern in checking for licenses and registrations, but they also recognized the need for non-discretionary procedures in obtaining such ends. Further, in *Brown v. Texas*, 443 U.S. at 50, 99 S.Ct. at 2640, 61 L.Ed.2d at 362, the Court enunciated three factors to be weighed in determining the reasonableness of seizures that are less intrusive than a traditional arrest: (1) the gravity of the public concerns served by the seizure, (2) the degree to which seizure advances the public interest, and (3) the severity of interference with individual liberty. *Brown* stated that a "central concern" in assessing the reasonableness of a traffic stopping scheme was to make certain, "an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field." *Id.* at 51, 99 S.Ct. at 2640, 61 L.Ed.2d at 362. *Brown* further stated, "[T]he seizure must be carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers." *Id.*

We now examine the constitutionality of the Hendricks County roadblock procedure in light of *Prouse* and *Brown* to determine if evidence seized pursuant thereto was seized unconstitutionally. The first determination to be made is whether this particular roadblock entailed random or discretionary stops, thereby running afoul of the rule in *Prouse*. This roadblock stopped five consecutive cars at a time, waving through for the following two to three minutes it took to conduct the check on the five cars being inspected. After a group of five was inspected and released, the next five consecutive vehicles were detained for the same procedure. All motorists of the stopped cars were asked to produce operators licenses or registration certificates. If a violation was suspected or alcohol consumption detected the driver was then pulled over to an adjacent parking lot. In our view, not only did this procedure adequately protect against the random and selective proscription of *Prouse*, but it further minimized the severity of interference with individual's liberties by not detaining motorists that the police could not inspect within a reasonable period of time.

Next, this roadblock procedure must be examined in light of the balancing factors enunciated in *Brown*. The first factor set out in *Brown*, the gravity of the public concerns served by the seizure, is weighed in favor of the State's roadblock procedure. As recognized in *Prouse*, the States have a legitimate concern in checking for automobile registration and certification. However, in our opinion this State has a much graver concern in detecting and deterring driving while intoxicated and under-age drinking. Approximately seven (7%) percent of the drivers checked that specific evening were intoxicated. The average number of deaths per year for the last ten (10) years attributable to drunk drivers in the United States is 25,000. The Supreme Court of the United States has recognized that the current state of affairs has resulted in such terrible carnage wreaked upon society by drunk drivers that the slaughter exceeds that of all our wars.

*South Dakota v. Neville*, (1983), 459 U.S. 553, 103 S.Ct. 916, 74 L.Ed.2d 748. Whatever the statistical comparison made, it is evidence our society has a grave concern in apprehending and deterring drunken driving and that traditional methods have not effectively combatted the problem. Consequently, public interest in detecting and deterring drunk driving is to be heavily weighed in favor of this particular roadblock procedure.

The second factor of *Brown* deals with the degree to which the seizure advances the public interest. This roadblock procedure advanced detection and prevention of drunken driving and detection of unlicensed driving to a successful degree, based on the available data. The State police released prior publicity in numerous newspapers concerning the plan to conduct roadblocks, but not of roadblocks in any specific location. This particular roadblock was maintained for two hours, during which twenty (20) citations were issued and seven arrests were made for driving while intoxicated. Considering approximately one hundred (100) cars were stopped during the two hours, the success of detection of violations being sought was very high. Accordingly, the second balancing factor of *Brown* weighs heavily in favor of this roadblock procedure. Future deterrence can only be speculative, but as the Supreme Court of Virginia stated in *Lowe v. Commonwealth of Virginia* (1985), 230 Va. 346, 337 S.E.2d 273, 277, *cert. denied* —— U.S. ——, 106 S.Ct. 1464, 89 L.Ed.2d 720 (1986), in upholding a similar roadblock program:

> "[T]he deterrent effect of such a highly publicized program is obvious; such a visible project is bound to increase the perceived risk of arrest in the minds of those drunk drivers who are never arrested."

The third factor enunciated in *Brown* must finally be considered: namely, the severity of interference with individual liberty. We are of the opinion that though a motorist's reasonable expectation of privacy is impinged upon to some degree, the severity of interference is minimal especially when considered in light of the great public concern involved here and the degree of successfully abating the social evil being addressed. Motorists involved in this roadblock were stopped for approximately two to three minutes. As a group of five consecutive cars were inspected, the following traffic was allowed to proceed. Despite announcements in local newspapers prior to the roadblock operation, the exact time and location was not announced. Obviously, such an announcement would have defeated the operation's purpose. Some citizens were undoubtedly delayed in their travels, however, numerous motorists, upon sighting the roadblock, turned their vehicles around and fled. Additionally, due to the high rate of arrests, the detained motorists not found to have violated any laws were directly benefitted by the removal of intoxicated drivers in the immediate vicinity. Balancing the *Brown* factors, we must conclude that the gravity of the public concern and the degree to which this roadblock procedure advanced detection and abatement of drunken as well as unlicensed driving outweighed the low level of interference with individual liberties.

Because of the overwhelming concern voiced by the United States Supreme Court regarding procedures such as this roadblock, we note that this roadblock plan entailed a "plan embodying explicit, neutral limitations on the conduct of individual officers." *Brown, supra.* The group of five cars, located in a well lighted area, were each asked to produce a license or registration. If a valid license or registration were produced and no indication of intoxication or underage drinking were detected, the car was allowed to proceed. All the officers were instructed as to this procedure and it was uniformly followed the entire two hours, thereby meeting the neutral plan requirement of *Brown.*

To the extent *State v. McLaughlin, supra,* conflicts with the law set out in this opinion, it is hereby overruled. *McLaughlin* can be interpreted to stand for the ruling that patrolling the roads and observ-

ing traffic is an equally efficient way to apprehend intoxicated drivers as stopping all motorists at roadblocks and examining them, thus precluding the use of roadblocks. We disagree with this broad statement and find that roadblock procedures, conducted in a constitutional manner can be a more effective means of detecting and deterring the important public concerns of driving while intoxicated or without proper licensing. This is not to imply that traditional methods of detecting drunken driving are ineffective. The procedure used in the roadblock in the immediate case is a good example of constitutionally valid roadblock operation. Having found the roadblock procedure in the instant case constitutional, it follows that the trial court erred in granting Petitioner Garcia's motion to suppress evidence. Accordingly, the trial court is reversed and ordered to proceed consistent with the opinion set out herein.

GIVAN, C.J., and DICKSON, J., concur.

DeBRULER, J., dissents with separate opinion in which SHEPARD, J., concurs.

SHEPARD, J., dissents with separate opinion.

DeBRULER, Justice, dissenting.

It is written in § 11 of the Indiana Bill of Rights that: "The right of the people to be secure in their persons, ..., against unreasonable ... seizure, shall not be violated; .." It is elementary and fully recognized by the majority opinion that the stopping of a car by the police on a public thoroughfare to investigate for crime constitutes a seizure of the driver and all other occupants of the car. In *Rutledge v. State* (1981), Ind., 426 N.E.2d 638, this court squared up to the issue in this manner:

Appellant contends that the police action in stopping his truck was an unreasonable seizure in violation of the Fourth and Fourteenth Amendments and Art. I, § 11, of the Indiana Constitution, and that evidence flowing from it and his attendant detention should have been excluded at trial. The stopping of a single car upon the street constitutes a physical and psychological intrusion upon the occupants of it, interferes with freedom of movement, causes inconvenience and consumes time. The show of authority is unsettling and creates substantial anxiety. *Delaware v. Prouse* (1979), 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660. Even a brief stop of an automobile and detention of its occupants constitutes a seizure, and is unreasonable in contravention of the Fourth Amendment in the absence of specific articulable facts which reasonably support an inference of a violation of the laws respecting use of the vehicle. *United States v. Brignoni-Ponce* (1975), 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607; *State v. Smithers*, (1971), 256 Ind. 512, 269 N.E.2d 874. In order to determine the reasonableness of such a warrantless intrusion, the court must examine the facts known to the officer at the time he stopped the car, and determine from those specifically articulable facts, and reasonable inferences from them, whether they reasonably warrant a suspicion of unlawful conduct. *United States v. Brignoni-Ponce* supra; *Terry v. Ohio,* (1968), 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889; *Lawrence v. State* (1978), 268 Ind. 330, 375 N.E.2d 208.

The officers expressly testified on the motion to suppress which the trial judge sustained, that they had not observed this defendant Garcia, or any of the other hundred drivers, or any of the many others who were occupants of the cars caught up in this mass detention, conduct him or herself in such a manner as to give rise to a reasonable suspicion of unlawful conduct. Indeed, the police had no other form of knowledge or information of any sort that any other individual was then upon this highway at this location and time who had violated or might be in the process of violating the law. In my opinion it is the time-honored requirement that there be an individualized, articulable suspicion of criminal intent or criminal conduct of a person, whether that person stands alone or within a group, which strikes the correct balance between the rights of citizens or groups of

citizens and their government's interest in exercising the power to seize.

While I am not persuaded to abandon the existing standards in this situation, I believe it is important to mark recognition of the fact that the new standard spun by the majority is based upon cases of the Supreme Court of the United States, which did not involve the type of traffic offender roadblocks which we have in this case. Therefore, wholesale reliance upon them is tenuous at best. Furthermore, in *Prouse, supra,* the court says within the longer quotation in the majority opinion that "questioning of all oncoming traffic at roadblock-type stops is one possible alternative." Two justices concurring specially saying "... I necessarily assume that the Court's reservation also includes other not purely random stops (such as every 10th car to pass a given point) that equate with, but are less intrusive than, a 100% road block stop." This observation drew no corrective response from the majority of the court. The procedure employed in the case before us did not involve the selection of all cars or even every 10th or 25th or 50th car, but as described, five cars were pulled from the stream, and others were then waved on through until those five were fully dealt with. Then five more were pulled over, and so on. This procedure provided an opportunity more than twenty times during the two hour period of the roadblock to used non-neutral criteria in selecting the cars to be pulled off. That opportunity alone casts serious doubt about the character of this roadblock under the majority's new standard.

SHEPARD, J., concurs.

SHEPARD, Justice, dissenting.

While it is clear that some roadblocks conform to the requirements of the Fourth Amendment, I am unable to find the same comfort in the case law of the U.S. Supreme Court in which the majority takes refuge. Each of the major decisions cited in support of today's ruling held a particular seizure unreasonable, save one approving a roadblock used by the national government to safeguard the country's frontier. A brief synopsis of these cases and the analytical principles which they provide unveil the deficiencies in the roadblock which "seized" appellee Ray Garcia.

### I. Supreme Court Cases

A. *United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975).

Two officers who had parked their car at the side of the highway decided to stop a vehicle to question the occupants about their citizenship and immigration status. They selected respondent's car solely because the occupants appeared to be of Mexican descent. The Supreme Court held that such roving patrols may stop vehicles with less than probable cause:

> ... because of the importance of the governmental interest at stake, the minimal intrusion of a brief stop, and the absence of practical alternatives for policing the border, we hold that when an officer's observations lead him reasonably to suspect that a particular vehicle may contain aliens who are illegally in the country, he may stop the car briefly and investigate the circumstances that provoke suspicion.

422 U.S. at 881, 95 S.Ct. at 2580.

The Court announced this as an extension of the so-called "Terry stop," which requires that the police officer "be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant ... the belief that his safety or that of others is in danger." *Terry v. Ohio*, 392 U.S. 1, 21, 27, 88 S.Ct. 1868, 1880, 1883, 20 L.Ed.2d 889, 906, 909 (1968). Approving roving patrol stops without requiring reasonable suspicion, the Court said, would subject lawful motorists to "potentially unlimited interference with their use of the highways...." 422 U.S. at 882, 95 S.Ct. at 2581. Justice Powell wrote: "We are not convinced that the legitimate needs of law enforcement require this degree of interference with lawful traffic," particularly because the "nature of illegal alien traffic

... tend[s] to generate articulable grounds for identifying violators." 422 U.S. at 883, 95 S.Ct. at 2581.

*B. United States v. Martinez-Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976).

The Court held that vehicle may be stopped at a permanent immigration checkpoint for brief questioning of the occupants even though there is no reason to believe that any particular vehicle contains illegal aliens. In this case, every car which entered the checkpoint was slowed to a "complete, if not virtual, halt." 428 U.S. at 546, 96 S.Ct. at 3078. Those cars which the Border Patrol suspected carried illegal aliens were directed to a secondary stop where the occupants were asked to produce citizenship or immigration documents. Selection for this secondary investigation was completely discretionary and not based upon reasonable suspicion.

The Court first examined the context in which the constitutional question of reasonable seizure arose. The *national* policy to limit immigration into the United States was frustrated by the flux of illegal aliens, 85% of whom came from Mexico. Moreover, the record indicated the effectiveness of the checkpoint based upon the rate of apprehension.[1]

Recognizing the necessity and effectiveness of these operations, the Court noted the "substantiality of the public interest in the practice of routine stops for inquiry at permanent checkpoints...." 428 U.S. at 556, 96 S.Ct. at 3082. The Court balanced this interest against the limited intrusion (defined as the "stop itself, the questioning, and the visual inspection") upon a motorist's right to free passage. The objective intrusion was deemed equivalent to that experienced in *Brignoni-Ponce,* but "checkpoint stops [are viewed] in a differ-

ent light because the subjective intrusion—the generating of concern or even fright on the part of lawful travelers—is appreciably less in the case of a checkpoint stop." 428 U.S. at 558, 96 S.Ct. at 3083.[2] Moreover, a permanent checkpoint reduced the degree of interference with the legitimate traffic, a distinction which separated this case from *Brignoni-Ponce:* "Motorists using these highways are not taken by surprise as they know, or may obtain knowledge of, the location of the checkpoints and will not be stopped elsewhere." 428 U.S. at 559, 96 S.Ct. at 3083. The Court concluded that "the purpose of the stops is legitimate and in the public interest, and the need for this enforcement technique is demonstrated by the records in the cases before us." 428 U.S. at 562, 96 S.Ct. at 3085. However, Justice Powell made clear the limited nature of the decision: "Our holding today, approving routine stops for brief questioning ... is confined to permanent checkpoints. We understand, of course, that neither longstanding congressional authorization nor widely prevailing practices justify a constitutional violation." 428 U.S. at 566 n. 19, 96 S.Ct. at 3087 n. 19.

*C. Delaware v. Prouse* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979).

A county patrolman stopped Prouse's car to check his license and registration without having observed traffic or equipment violations or any suspicious activity. The Court held that the Fourth Amendment requires at least articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, or that he is violating some other law.

Though accepting as "vital" the State's interest in promoting highway safety by apprehending unlicensed drivers, unregistered or stolen vehicles, and drug or alcohol intoxicated drivers, the Court said:

---

**1.** "During an eight-day period in 1974, ... roughly 146,000 vehicles passed through the checkpoint during 124⅙ hours of operation. Of these, 820 vehicles were referred to the secondary inspection area, where Border Patrol agents found 725 deportable aliens in 171 vehicles." 428 U.S. at 554, 96 S.Ct. at 3081. Therefore, 21% of the vehicles contained illegal aliens.

**2.** In *Prouse,* the Court noted that the "crucial distinction" between *Martinez-Fuerte* and *Brignoni-Ponce,* was the "lesser [subjective] intrusion upon the motorist's Fourth Amendment interests." 440 U.S. at 656, 99 S.Ct. at 1397.

The question remains, however, whether in the service of these important ends the discretionary spot check is a sufficiently productive mechanism to justify the intrusion upon Fourth Amendment interests which such stops entail. On the record before us, that question must be answered in the negative. Given the alternative mechanisms available, both those in use and those that might be adopted, we are unconvinced that the incremental contribution to highway safety of the random spot check justifies the practice under the Fourth Amendment.

440 U.S. at 659, 99 S.Ct. at 1399.

The Court concluded that the marginal contribution to roadway safety from spot checks did not justify subjecting the lawful motorist to this seizure:

By hypothesis, *stopping apparently safe drivers is necessary only because the danger presented by some drivers is not observable at the time of the stop.* When there is not probable cause to believe that a driver is violating any one of the multitude of applicable traffic and equipment regulations or other articulable basis amounting to reasonable suspicion that the driver is unlicense or his vehicle unregistered—we cannot conceive of any legitimate basis upon which a patrolman could decide that stopping a particular driver for a spot check would be more productive than stopping any other driver.

440 U.S. at 661, 99 S.Ct. at 1400 (emphasis added).

D. *Brown v. Texas* 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979).

Police on patrol noticed appellant walking in an alley located in an area with a high incidence of drug traffic. They stopped him and asked that he provide identification and explain what he was doing. The Court found that "[i]n the absence of any basis for suspecting appellant of misconduct, the balance between the public interest, and appellant's right to personal security and privacy tilts in favor of freedom from police interference." 443

U.S. at 52, 99 S.Ct. at 2641. The Court noted that the State's interest, the prevention of crime, was a "weighty social objective," but, "even assuming that purpose is served to some degree by stopping and demanding identification from an individual without any specific basis for believing he is involved in criminal activity, the guarantees of the Fourth Amendment do not allow it." *Id.*

## II. Principles for Determing Whether a Search is Reasonable

When the police stop motorists at a roadblock to check their license or registration and for any signs of intoxication, a "seizure" subject to the requirements of the Fourth Amendment occurs. The salient inquiry is the reasonableness of this seizure. The purpose of the Fourth Amendment is to safeguard the privacy and security of individuals against arbitrary invasions by government officials. The reasonableness of the seizure is judged by balancing the intrusion on individual liberty against its promotion of legitimate governmental interests. This standard requires, at a minimum, that the facts which support an intrusion are capable of measurement against an objective standard, whether this be probable cause or a less stringent test. *Prouse,* 440 U.S. at 653, 654, 99 S.Ct. at 1395, 1396.

To determine whether the Fourth Amendment will tolerate seizure in the absence of articulable suspicion or probable cause, American courts engage in a balancing of several considerations: (1) the gravity of the public concern served by the seizure, (2) the severity of interference with individual liberty, and (3) the degree to which the seizure advances the public interest. *Brown,* 443 U.S. at 50, 51, 99 S.Ct. at 2640, 2641.

### A. Gravity of Public Interest

In the cases noted above, only one seizure involved a public interest of sufficient gravity to justify dispensing with reasonable suspicion. In *Martinez-Fuerte,* the Court found that the substantial national

interest in the effective control of aliens illegally crossing the Mexico-United States border outweighed the limited intrusion on the right to free travel; it cited language in *Carroll v. U.S.*, 267 U.S. 132, 154, 45 S.Ct. 280, 285, 69 L.Ed. 543, 551 (1925), distinguishing seizures of American motorists from those whose objective was "national self-protection."

None of the public interests advanced in the other cases proved adequate to justify a stop on less than reasonable suspicion: *Brignoni-Ponce* (the "valid" interest in economic and social problems created by illegal immigration), *Prouse* (the "legitimate" interest in promoting safety on the highways), and *Brown* (crime prevention, a "weighty" social objective). In these cases, the interference with the lawful motoring public and the tendency of the designated problem to generate articulable grounds for identifying violators were the crucial criteria which convinced the Court that reasonable suspicion must be demonstrated.

### B. Severity of the Interference

The intrusions involved in most of these cases, a momentary stop and brief questioning, can be objectively regarded as modest. However, even the most limited seizure is "constitutionally cognizable." *Prouse*, 440 U.S. at 661, 99 S.Ct. at 1400. Even though the stop in *Brignoni-Ponce* was similar to the one in *Martinez-Fuerte*, the Court found that the permanent checkpoint in the latter case was likely to be regarded by motorists as less intrusive. Roving patrols frequently operate at night, and their approach may frighten motorists, noted Justice Powell. However, the subjective intrusion at permanent checkpoints is minimal because motorists can see other vehicles stopped and visible signs of officers' authority. *Martinez-Fuerte*, 428 U.S. at 558, 96 S.Ct. at 3083.

As for the degree of interference imposed upon the lawful motoring public, the *Brignoni-Ponce* Court found that dispensing with reasonable suspicion would subject every resident to "potentially unlimited interference with their use of the high-ways...." 422 U.S. at 882, 95 S.Ct. at 2581. However, the *Martinez-Fuerte* Court found that the permanent checkpoint did not intrude similarly on lawful motorists because they "... know or may obtain knowledge of, the location of the checkpoints and will not be stopped elsewhere," and the checkpoints involve less discretionary enforcement. 428 U.S. at 559, 96 S.Ct. at 3083.

### C. Degree to which Seizure Advances Interest

A seizure is not reasonable unless it is well calculated to effectuate its purpose. Moreover, to justify a seizure on less than articulable suspicion or probable cause, the government must demonstrate that the method chosen is necessary and effective, and more effective than alternative mechanisms.

In *Martinez-Fuerte*, substantial evidence demonstrated the checkpoint's effectiveness in detecting illegal aliens. The requirement of reasonable suspicion was impractical because the heavy flow of traffic (1,176 cars per hour) precluded the "... particularized study of a given car that would enable it to be identified as a possible carrier of illegal aliens." 428 U.S. at 557, 96 S.Ct. at 3083. The record substantiated the effectiveness of the checkpoint and it appeared that the law enforcement need in question "could be met without reliance on routine checkpoint stops." 428 U.S. at 556–557 n. 12, 96 S.Ct. at 3082 n. 12.

The necessity for even a minimal degree of interference had not been demonstrated in *Prouse* and *Brown*. In *Prouse*, the Court recognized that keeping dangerous automobiles and drunk drivers off the highway was a legitimate public interest, but concluded that roving patrols were not a sufficiently productive mechanism because of their incremental contribution to highway safety. The low productivity of the roving patrol stop was similarly cited in *Brown*, 443 U.S. at 52, 99 S.Ct. at 2641.

Finally, I think the Court has made it clear that when a given crime is one which can be frequently detected through obser-

vation (like driving offenses), it is unlikely that stops on less than reasonable suspicion are constitutional. *Brignoni-Ponce*, 422 U.S. at 882, 883 n. 8, 95 S.Ct. at 2581 n. 8; *Prouse*, 440 U.S. at 659, 99 S.Ct. at 1399.

### III. This Roadblock Fails Under the Case Law

In *Prouse*, Justice White wrote for the Court:

> ... except in those situations in which there is at least articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law, stopping an automobile and detaining the driver in order to check his driver's license and the registration of the automobile are unreasonable under the Fourth Amendment. This holding does not preclude the State of Delaware or other States from developing methods for spot checks that involve less intrusion or that do not involve the unconstrained exercise of discretion. Questioning of all oncoming traffic at roadblock-type stops is one possible alternative.

440 U.S. at 663, 99 S.Ct. at 1401 (emphasis added).

The majority cites this dictum as one basis for affirming the constitutionality of the roadblock in this case. Dissenting in *Prouse*, Justice Rehnquist noted the peculiar dichotomy in requiring reasonable suspicion to stop an individual motorist while dispensing with that standard when the motoring public is seized *en masse:*

> Because motorists, apparently like sheep, are much less likely to be 'frightened' or 'annoyed' when stopped en masse, a highway patrolman needs neither probable cause nor articulable suspicion to stop *all* motorists on a particular thoroughfare, but he cannot without articulable suspicion stop *less* than all motorists. The Court thus elevates the adage 'misery loves company' to a novel role in Fourth Amendment jurisprudence. The rule becomes 'curiouser and curiouser' as

one attempts to follow the Court's explanation for it. ... Indeed, the Court does not say that these interests can never be infringed by the State, just that the State must infringe them en masse rather than citizen by citizen. To comply with the Fourth Amendment, the State need only subject *all* citizens to the same 'anxiety' and 'inconvenien[ce]' to which it now subjects only a few.

440 U.S. at 664, 666, 99 S.Ct. at 1401, 1403.

Justice Rehnquist argued in *Prouse* that reasonable suspicion should not be required for a spot check because "[t]he whole point of enforcing motor vehicle safety regulations is to remove from the road the unlicensed driver before he demonstrates why he is unlicensed ... [rather than when] the wreckage is being towed away." 440 U.S. at 666, 99 S.Ct. at 1402.

The *Prouse* reed upon which this Court leans must be construed within its context. Justice White analyzed the seizure in *Prouse* by comparing *Brignoni-Ponce* and *Martinez-Fuerte*. His suggestion that "questioning of all oncoming traffic at roadblock-type stops is one possible alternative" calls to mind the earlier approval in *Martinez* of a permanent roadblock which did not present any subjective intrusion on lawful motorists and which effectively achieved its national security ends. However, there are several bases upon which the constitutionality of the *Martinez-Fuerte* roadblock may be distinguished from the roadblock in the case at bar.

Among the distinguishing factors is the gravity of the public interest. Control of our borders has traditionally been regarded as justifying severe measures. Foreigners who visit or immigrate to this country are subjected to search and seizure when they pass through the ports of entry. The need to manage the influx of immigrants and control the potential for the spread of contagious disease has been said to justify arbitrary steps. *Carroll v. United States*, 267 U.S. 132, 154, 45 S.Ct. 280, 285, 69 L.Ed. 543 (1925). The carnage caused by drunk drivers needs no documentation and has been acknowledged by this Court and

the U.S. Supreme Court as a compelling interest.[3] However, if controlling this offense is to be equated with national security, it seems likely that most felonies could be fairly declared grave national problems.

The permanent nature of the *Martinez* checkpoint was deemed important because it reduced the subjective intrusion on lawful motoring. By contrast, the roadblock currently under consideration gave an approaching motorist no forewarning until 2/10 to 4/10 of a mile preceding the roadblock. At that point, the approaching motorist could perhaps see the congestion ahead, but had no notice that the congestion represented a duly authorized roadblock.

Moreover, there was a basis in evidence upon which the Court concluded in *Martinez-Fuerte* that alternative mechanisms to promote the same ends which would be less intrusive and reasonably effective were not available. There is no determination of relative effectiveness in the instant case. Indeed, there is little to assess the actual effectiveness of the roadblock. While the majority states flatly that "[a]pproximately seven (7%) percent of the drivers checked that specific evening were intoxicated," the reality of the record is that there is no substantial basis for saying so.[4]

Finally, when the nature of the prohibited conduct was subject to observable, articulable grounds for identifying violators, the *Brignoni-Ponce* and *Prouse* Courts accorded this factor substantial weight. Appellee Garcia, of course, was charged with a crime that is commonly observable.

## IV. Roadblock Procedures

If, as this Court announces, "the procedure used in the roadblock in the immediate case is a good example of constitutionally valid roadblock operation," it is important to identify the specific procedures which the majority deems to be adequate under the Fourth Amendment. All the federal cases cited above are helpful in outlining practices which might comply with the Fourth Amendment. As the only case holding a seizure constitutional, *Martinez* is the most useful an defining appropriate procedures:

(1) *Advance warning of roadblock.* In *Martinez-Fuerte*, approaching motorists were notified, by a sign with flashing lights, one mile preceding the roadblock, that all vehicles must stop in one mile. Another sign warned motorists at 3/4 mile preceding the roadblock to "WATCH FOR BRAKE LIGHTS." At the checkpoint, there were two large signs with flashing lights, "STOP HERE, U.S. OFFICERS." *Martinez-Fuerte*, 428 U.S. at 545, 546, 96 S.Ct. at 3077.

(2) *Safety considerations.* The checkpoint was situated on flat terrain where there was a permanent building and floodlights. *Martinez-Fuerte*, 428 U.S. at 546, 96 S.Ct. at 3077.

(3) *Seizure.* All vehicles[5] were brought to a "virtual, if not a complete, halt" and were screened by the Border Patrol agents. *Martinez-Fuerte*, 428 U.S. at 546, 96 S.Ct. at 3078.

(4) *Minimal interference with lawful traffic.* The public had knowledge of the

---

3. *South Dakota v. Neville,* 459 U.S. 553, 103 S.Ct. 916, 74 L.Ed.2d 748 (1983); *Mackey v. Montrym,* 443 U.S. 1, 99 S.Ct. 2612, 61 L.Ed.2d 321 (1979); *Ruge v. Kovach* (1984), Ind., 467 N.E.2d 673.

4. The supervisor of the roadblock testified that he did not know how many cars were stopped altogether but thought it was "a hundred and some." Asked how many people were jailed, he said he did not know. Asked if it was as many as twenty, he said: "Oh, no, it was people that went to jail was like six or seven." There is *nothing* to indicate how many individuals were arrested for each offense which formed the purpose of the roadblock. This information consti-

tutes the *only* information in the record on effectiveness.

5. The *Prouse* Court concluded that the spot check was analogous to the roving patrol rather than the permanent checkpoint. The Court noted that "[f]or Fourth Amendment purposes, we also see insufficient resemblance between sporadic and random stops of individual vehicles making their way through city traffic and those stops occasioned by roadblocks where *all* vehicles are brought to a halt or to a near halt, and *all* are subjected to a show of the police power of the community." *Prouse,* 440 U.S. at 657, 99 S.Ct. at 1398 (emphasis added).

exact location of the checkpoint and knew they would not be stopped elsewhere and could avoid the roadblock. There was no discretionary enforcement because only cars passing through the checkpoint could be stopped. *Martinez-Fuerte,* 428 U.S. at 559, 96 S.Ct. at 3083. (5) *Location based upon effectiveness.* The location of the checkpoint was made by "officials responsible for making overall decisions as to the most effective allocation of limited enforcement resources," not the field officers. Moreover, the location was a reasonable decision based upon criteria designed to ensure effectiveness: avoid interference with traffic in populated areas near border, close to significant roads leading away from border, situated in terrain that restricts vehicle passage around checkpoint, on a stretch of highway compatible with safe operation, and beyond zone where border passes are valid. *Martinez-Fuerte,* 428 U.S. at 553, 559, 96 S.Ct. at 3080, 3083. (6) *Discretion limited.* A seizure not based upon reasonable suspicion should be "carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers." *Brown,* 443 U.S. at 51 [99 S.Ct. at 2640]. Standards, guidelines, or procedures promulgated by either his department or the state attorney general would assure proper action. *Prouse,* 440 U.S. at 650 [99 S.Ct. at 1394]. The stop and inquiry must be reasonably related in scope to the justification for their initiation. *Brignoni-Ponce,* 422 U.S. at 881 [95 S.Ct. at 2580].

A thorough examination of the record indicates that the roadblock procedures used in this case, which the Court holds to be constitutional, are:

(1) *Knowledge of roadblock location.* The State police released prior publicity through the newspapers of the plan to conduct roadblocks, but did not indicate particular locations.

(2) *Selection of location.* Several possible roadblock locations were selected by a sergeant who supervises the State Police troopers in Hendricks County. He then conferred with a lieutenant and another officer of the Hendricks County sheriff's department and the participating field officers; a joint decision was made on the roadblock location. They chose this location "because it was on print outs that our department has, it shows that the road generates a lot of driving accidents involving alcohol percentage wise on the road." None of this data is part of the record. As noted above, the effectiveness of this roadblock in detecting drunk drivers is essentially unknown.

(3) *Guidelines.* The sergeant who was ordered to do the roadblock received "nothing in. writing" about methodology. He did have "some information from Marion County and Morgan County. Guidelines they had set down." The record does not contain any written plan or indicate what the supervisor on site conveyed to those working the roadblock. "Basically, it is just common sense about the way you do things," he testified.

(4) *Roadblock operation.* Westbound traffic on U.S. 40 was stopped by 11 uniformed officers. The left lane was funnelled into the right westbound lane using flares and the red flashing lights of two police cars; one car parked in the passing lane and the second car parked on the shoulder. A State Police sergeant was in charge of the participating State Police and a lieutenant with the sheriff's department supervised the county officers. Cars were stopped in groups of five, while the officers were investigating one group the remaining traffic passed through the roadblock without questioning, then another group of five would be questioned after the officers had finished with the preceding group.[6]

---

**6.** After a group of cars had been stopped and investigated, then the police "would go back out to the roadway and when we was prepared, stop the next five cars ..." Record at 100. The supervising officer of the State Police testified at the suppression hearing that "a lot depended on the luck of the draw whether or not you were stopped that night" and that defendant "was one

If a person was suspected of drunk driving then the driver would be further detained at a secondary location adjacent to the roadblock.

(5) *Safety considerations.* Approaching motorists were not warned that a roadblock was ahead. Moreover, an approaching motorist would not see the flares until he was within two to four tenths of a mile.

It is reasonably easy to see how these procedures fall short under Supreme Court case law. First, while the general public who read the newspaper accounts of the intended roadblocks may have been forewarned, approaching motorists did not have notice of the impending congestion until they were 2/10 to 4/10 of a mile away. The State Police sergeant testified that motorists might have assumed the congestion was an accident. Indeed, there is no indication in the record that detained motorists were advised of the roadblock's purpose. This absence of notice not only affects safety, but also increases the subjective intrusion experienced by the public. Public safety was also implicated by the decision to locate the roadblock at a spot where curves in the road before it and after it limited visibility.

Second, allowing field officers to decide where to stop motorists raises the risk of arbitrary or oppressive action. A sergeant of the State Police assigned to the county along with Sheriff's officers and field deputies determined the location. A commander responsible for making decisions based upon the "most effective allocation of limited enforcement resources" was not involved.

Third, the location decision should be based on empirical data designed to ensure effectiveness. In this case, the record does not include the data upon which the decision was made. This Court's approval of a decision for which there is no evidence in the record is tantamount to declaring that

the unsubstantiated conclusions of the field officers are adequate under the Fourth Amendment. This clearly is not so. While the rate of apprehension is one measure of effectiveness of the mechanism used, there is nothing substantial in the record to indicate the apprehension rate for this roadblock. As for its effectiveness compared to other methods, we have no evidence at all.

Finally, the participating officers should act pursuant to guidelines. In this case, not even the supervising officer received any written guidelines from his superiors. While "common sense" is an excellent prescription, it does not provide any basis upon which this Court can determine whether the decisions were indeed neutral and explicit. In effect, the field officers' discretion was unlimited. Among the neutral criteria for selecting vehicles, according to the testimony, was "luck."

The majority indicates that *State v. McLaughlin* (1984), Ind.App., 471 N.E.2d 1125, is overruled to the extent it conflicts with this decision. The Court of Appeals held the roadblock in *McLaughlin* unconstitutional. The operation and procedure of the *McLaughlin* roadblock were as follows:

(1) *Roadblock location.* The roadblock was held on a flat stretch of straight road. An Indiana State Police squad sergeant decided the location of the roadblock based upon his knowledge and experience as a State Police officer and consideration of "studies" which were "an accumulation of accidents that have occurred maybe on that road over a given period of time, which could be a year." However, the sergeant did not know the base years of the study, the number of accidents or their nature; he was aware of one multiple fatality which was an alcohol-related accident during the preceding two years. *McLaughlin*, 471 N.E.2d at 1137, 1139.

---

of the unlucky five who were pulled over." Record at 115, 126. The supervisor also testified that no one was preempted from the detention: "There have been police officers and fire-men that have come through that have been stopped. Easily, they pull in there where the police cars are parked to find out what is going on." Record at 101.

(2) *Knowledge of roadblock.* There were flares and police cars with flashing red lights located one-quarter mile ahead of the roadblock. There was no warning sign or notice why vehicles were being stopped. Moreover, the record indicated that the public did not have advance notice of this roadblock or of the decision to establish roadblocks in the area. *McLaughlin*, 471 N.E.2d at 1138–39.

(3) *Roadblock procedure.* Every car was stopped.

(4) *Discretion exercised by officers.* The squad sergeant had "complete discretion to decide the location, duration and frequency of the roadblocks." *McLaughlin*, 471 N.E.2d at 1140. The actual conduct of the roadblock (which cars to stop, how to conduct the questioning of drivers, and how to handle those suspected of violating the law) was prescribed by Marion County prosecutor's office guidelines. These guidelines were given to the squad sergeant. A participating field officer testified that he had not read these guidelines prior to his participation in the roadblock, but rather acted upon the squad sergeant's oral instructions.

Reading *McLaughlin* as "good law" only to the extent it conforms to today's decision helps clarify what the majority regards as a permissible seizure under the Fourth Amendment. A roadblock need not stop all vehicles (*McLaughlin*), only some, and the detainees may be chosen at random (*Garcia*). The seizure may by supervised by a field officer with rank. He may do so without any written, reviewable plan. The decision to stop motorists at a given location may be shared by individual troopers and ranking officers (in today's case) rather that by a single ranking State Police officer (*McLaughlin*). Furthermore, the decision to locate a roadblock at a given place is apparently not reviewable by the judiciary. In the case at bar, the location was based generally upon accident data collected by the State Police, but there is no specific information which served as the basis for this decision. In *McLaughlin*, the decision was based upon a squad ser-

geant's own experience and knowledge, and unidentified "studies."

Reading today's decision and what remains of *McLaughlin*, it appears that roadblocks are constitutional under a Gresham's Law theory of the Fourth Amendment.

1. Roadblocks may be used to find perpetrators of any crime deemed grave by society.

2. The Fourth Amendment rule of probable cause or articulable suspicion may be suspended without any demonstration that the roadblock is more effective than traditional methods of apprehending such offenders.

3. Roadblocks may be carried out according to any plan field officers regard as reasonable and the plan need not be available for judicial review.

4. The decision about location of the roadblock may be made by field officers and it is not necessary to establish why a given site was chosen by providing any reviewable evidence.

5. Decisions about where to locate the roadblock and who to stop may be made by field officers. It is not necessary that anyone in the headquarters command structure take part.

I submit that a roadblock carried out under these conditions cannot be distinguished from virtually any random stop made by law enforcement officers searching for various types of felons.

Among our duties is to articulate the constitutional principles which separate America as a free society from those which are not so free. It is "emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803). I dissent today largely because what the Court says about the Fourth Amendment is too little.

Lastly, while the Court has rejected Garcia's Fourth Amendment claim, it has not so much as mentioned, much less purported to decide, the rights assured under Art. I,

§ 11 of the Indiana Constitution. I take it that question is to be decided another day.

DeBRULER, J., joins in this dissent.