Kenneth BANKS, Jr., Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 49A02–9604–CR–192.

Court of Appeals of Indiana.

June 12, 1997.

Andrew C. Maternowski, Indianapolis, for Defendant–Plaintiff.

Pamela Carter, Attorney General, Andrew L. Hedges, Deputy Attorney General, Indianapolis, for Appellee–Plaintiff.

## OPINION

CHEZEM, Judge.

### Case Summary

Appellant-Defendant, Kenneth Banks, Jr. ("Banks") appeals his conviction for Carrying a Handgun Without a License, a class C felony. We affirm.

### Issue

Banks presents one issue for our review which we restate as: whether evidence seized from him during a patdown search was properly admitted at trial.

### Facts and Procedural History

The facts most favorable to the judgment indicate that on July 22, 1995, Banks was a passenger in the back seat of a car stopped at a sobriety checkpoint in Indianapolis at approximately 11:15 p.m. Two other individuals were also in the vehicle. Detective Lloyd Morgan ("Morgan") questioned the driver of the vehicle and was advised that the driver had neither a vehicle registration nor a driver's license in his possession. (R. 91–92). When Morgan asked who owned the car, the driver responded that it was owned by a friend whose name the driver did not know. While conversing with the driver, Morgan detected the odor of alcohol (R. 98–99), and noticed an open, partially-empty, 40–ounce bottle of beer on the vehicle's front seat, between the driver and the front seat passenger. (R. 92). At this point, Morgan asked the driver to "pull off line," meaning move his car to the area set aside for obtaining further information from the driver. (R. 92–93).

As part of "normal procedure," Morgan then asked the driver to step out of the vehicle, asked him his name, age, date of birth, and if anyone in the car was twenty-one or older. When the driver stated that all of the car's occupants were under twenty-one, Morgan asked the passengers to exit the car. As Banks and the front seat passenger stepped out of the car, Morgan noticed that they both showed signs of intoxication, and observed a gun in plain view on the front passenger-side floorboard. At approximately the same moment, Sergeant Michael Himmel ("Himmel") found a gun during an external patdown of Banks, and, as per police procedure, yelled "gun!" (R. 120).

The driver received a "UTT" for operating a vehicle with no license in his possession. The front seat passenger was charged with a weapons count. Banks was charged with Carrying a Handgun Without a License. Neither alcohol-related charges nor car theft charges were brought against the car's occupants. Prior to trial, Banks filed a motion to suppress, alleging that the gun was the product of an unconstitutional stop and search. After holding an evidentiary hearing on the motion, the trial court denied the motion to suppress, and incorporated the evidence from the suppression hearing into a bench trial. Banks was found guilty as charged.

### Discussion and Decision

■ Banks argues that the trial court should have granted his motion to suppress

the gun found as a result of the patdown search. On appeal, Banks's sole contention is that the patdown search, conducted after he entered the sobriety checkpoint stop, was not based upon a reasonable belief, supported by articulable facts, that he was armed and dangerous. For support, he relies upon *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) and three Indiana cases.

A trial court has broad discretion in ruling on the admissibility of evidence and in determining its relevancy. *Kremer v. State,* 514 N.E.2d 1068, 1073 (Ind.1987). We will disturb its ruling only upon a showing of abuse of that discretion. *Shinault v. State,* 668 N.E.2d 274, 276 (Ind.Ct.App.1996). Relevant evidence is not inadmissible merely because it is prejudicial. *Kremer,* 514 N.E.2d at 1073.

Recently, the United States Supreme Court held that a police officer making a lawful traffic stop may order passengers—as well as the driver—to exit the vehicle pending completion of the stop. *Maryland v. Wilson,* —— U.S. ——, ——, 117 S.Ct. 882, 886, 137 L.Ed.2d 41 (1997). *Maryland* is different from the present case in three respects: (1) the police officer in *Maryland* stopped the car for speeding rather than as part of a sobriety checkpoint plan; (2) Wilson, the front passenger, repeatedly ducked down in the seat during the pursuit and was sweating and extremely nervous while the driver was questioned; and (3) as Wilson exited the vehicle, cocaine fell to the ground, i.e. the cocaine evidence was not the result of a patdown search, or frisk. Despite its differences, *Maryland* is instructive regarding permissible procedures at lawful stops.

■ First, we examine what constitutes a lawful stop. Although both the United States and Indiana constitutions require a warrant in order to stop and search a person, there are some well-established exceptions to the warrant requirement. *Stone v. State,*

671 N.E.2d 499, 501 (Ind.Ct.App.1996). Sobriety checkpoints are an exception to the traditional warrant requirement. If a sobriety roadblock plan satisfies the three-prong balancing test set out in *Brown v. Texas,* 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979), stops "may be made without probable cause or a reasonable suspicion." *Snyder v. State,* 538 N.E.2d 961 (Ind.Ct.App.1989)(discussing *State v. Garcia,* 500 N.E.2d 158, 163 (Ind. 1986), *cert. denied,* 481 U.S. 1014, 107 S.Ct. 1889, 95 L.Ed.2d 496 (1987)), *trans. denied.*

Because valid[1] sobriety checkpoints are recognized as lawful stops, *Maryland* indicates that both drivers and passengers may be asked to exit the vehicle during these roadblock stops. What neither *Maryland* nor *Garcia* indicates is that an officer may automatically perform a patdown search of both the driver and the passengers who are lawfully stopped at a sobriety checkpoint. Rather, in Indiana, we have adopted the *Terry* exception with regard to patdown searches. *Wilson v. State,* 670 N.E.2d 27, 29 (Ind.Ct.App.1996).[2]

■ In *Terry,* the United States Supreme Court established the rule that "a police officer 'justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others,' is entitled to conduct a limited patdown search of the suspect's outer clothing to search for a weapon." *Jackson v. State,* 669 N.E.2d 744 (Ind.Ct.App.1996)(*quoting Terry,* 392 U.S. at 24, 88 S.Ct. at 1881). When conducting this patdown search, the officer need not be absolutely certain that the individual is armed, but only that a reasonably prudent person in the same circumstances would be warranted in believing that the officer's safety was in danger. *Id.* In determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate "hunch," but to the specific reasonable infer-

---

1. On appeal, Banks does not argue that the sobriety checkpoint at which he was stopped did not meet the three-prong *Brown* test.

2. *Terry* also sets out another well-known exception to the warrant requirement. That is, the police, without a warrant or probable cause, can

briefly detain [stop] an individual for investigatory purposes if, based on specific and articulable facts, the officers have a reasonable suspicion of criminal activity, even if they lack probable cause under the Fourth Amendment. *Wilson,* 670 N.E.2d at 29.

ences which he is entitled to draw from the facts in light of his experience. *Terry*, 392 U.S. at 27, 88 S.Ct. at 1883.

Next, we examine whether the patdown search of Banks met the requirements set out in *Terry*. During cross-examination of Morgan, the following colloquy occurred:

Q.... Prior to asking [the driver] to exit the car, uh, did he do anything, in your mind, that indicated he might be armed?

A. Uh, no, sir. Uh, I always approach each vehicle the same way.

Q. Were you told by any of the other deputies that ... or any of the other law-enforcement out there ... that any of the passengers did anything that indicated they might be armed?

A. No, sir.

(R. 104–05).

During direct examination of Himmel, the following discussions took place:

Q. Okay, and, uh, did you ask the defendant to leave the vehicle?

A. No, I did not.

Q. Okay, what happened, he ...

A. I motioned to Officer Morgan that I was uncomfortable with the stop and that we needed to pull the people out of the vehicle.

Q. Um hum.

A. I made a ...

The Court: Why were you uncomfortable, sir?

A. Because nobody knew whose car it was. Uh, he was asking questions about the ownership of the car. Nobody would come up with the name of the people that owned the car. Uh, we were dealing with what I thought was probably an intoxicated driver and, probably, intoxicated passengers.

(R. 116–17).

Q. [by State] Uh, at ... okay, after [the car] was pulled off the side of the road, uh, how did ... Banks end up leaving the vehicle ... did you ask him to leave the vehicle?

A. Officer Morgan asked everybody to exit the vehicle.

Q. Is that normal procedure?

A. Yes, it is.

Q. Okay, once they exited the vehicle?

A. I made a pat-down.

Q. And, uh, at that time, was that before or after you heard that there was weapon on the, in the front floorboard?

A. I am the officer that originally yelled, "Gun".

Q. Okay, and that was the gun ...

A. I made the first, uh, first remark that there was a gun.

Q. And that was the gun that you found on the defendant?

A. Yes.

Q. Okay ... And, uh, what is your ... do you remember asking the defendant if he had a weapon on him?

A. I believe I did ask him, as I was patting him down. I believe I did ask him if he had a gun, and I believe he told me he did.

Q. All right, and that was all?

A. He gave me no problems.

(R. 119–21).

Cross-examination of Himmel included the following exchanges:

Q. Sergeant, you indicated that Mr. Banks gave you no problems. Am I to take it, then, that prior to you patting him down and finding the gun, he didn't do anything to indicate that he was armed?

A. No, sir, he never gave me any indication, while he was sitting straight and rigid in the back seat, that he had a gun.

\* \* \* \* \* \*

A. I had, uh, Officer Morgan ask[ed] him to exit the vehicle. He exited the vehicle. I started to pat him down. At the same time I'm patting him down I'm asking him, "Do you have any knives or guns," and I believe, sir, he told me he had a gun ... at the same time I found it.

Q. None of the passengers did anything that indicated that any of the passengers were armed, prior to that?

A. I didn't deal with any ... I didn't deal ... your client is the only one I dealt with. I can't testify to what the ... I wasn't

watching the right front passenger or the driver.

Q. Okay. So you didn't observe anything, then?

A. No.

Q. Nor did any of the other officers tell you anything that led you to believe that anybody in that car was armed?

A. No.

    \*      \*      \*      \*      \*      \*

Q. Okay. Did you have any reason to think that that particular car was stolen, had you received any reports about a stolen car fitting that description?

A. No, sir.

(R. 121–24).

We are inclined to conclude that if Himmel believed Banks was armed and presently dangerous to Himmel or to others, Himmel stated no reason for that belief.[3] Prior to the patdown, Banks never gave any indication that he was armed. Banks made no furtive movements; indeed, he sat "straight and rigid in the back seat." (R. 122). Moreover, this was not a situation involving a lone police officer in a high crime area. This was a highly controlled sobriety checkpoint, with fifteen officers on hand. Morgan stated that nothing indicated the driver or the passengers might be armed. Thus, Morgan could not have conveyed contrary information to Himmel. Himmel did not know about the gun on the front passenger side floorboard until after he commenced his patdown of Banks. Himmel had no indication that anyone was armed until he found the gun on Banks. *Cf. Zelmer v. State,* 177 Ind.App. 636, 380 N.E.2d 618 (1978) (patdown search held lawful since officer knew defendant from previous encounters and felt him capable of violence; also, defendant approached the officer in an aggressive and hostile manner before the officer even had a chance to get out of his car).

Himmel did testify that he was "uncomfortable" because nobody knew to whom the car belonged (i.e., insinuating the car was stolen) and because he thought they might be dealing with intoxicated persons. For a variety of reasons, we are not convinced his testimony is sufficient to meet the *Terry* standard. First, while a reasonably prudent person would be warranted in believing that a suspected car thief might carry a weapon, Himmel answered negatively to the questions of (1) whether he had any reason to think that the car was stolen or had received any reports about a stolen car fitting that description; and, (2) whether he had any indication that the car's occupants might be armed. Second, we are not convinced that an officer's suspicions that a person is drinking while underage necessarily supports the inference that a person is armed and presently dangerous.[4] Furthermore, if the officers truly suspected a stolen car, they could easily have run a check on the vehicle. Likewise, if underage drinking was suspected, a simple request for identification showing the suspect's age would have been a logical, relatively non-intrusive first step. *Cf. Warr v. State,* 580 N.E.2d 265, 267 (Ind.Ct.App.1991). Yet, the officers did neither of these thing before a patdown search of Banks was conducted. That is, they failed to use the least restrictive means for effectuating the stop. *See Florida v. Royer,* 460 U.S. 491, 501, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229 (1983). Thus, the patdown search of Banks was not justified.

■ In spite of the problematic patdown search of Banks, we do not automatically hold that the trial court abused its discretion in admitting the gun found upon Banks. Instead, we examine the inevitable discovery exception to the exclusionary rule. The Seventh Circuit recently explained the doctrine of inevitable discovery and its rationale:

> In striking a balance between society's interest in deterring police misconduct and its comparable concern that juries not be deprived of probative evidence, the Supreme Court has concluded that when the authorities have seized evidence in viola-

---

**3.** We use "if" in this sentence because in view of Himmel's testimony, it does not appear that he necessarily believed Banks was armed or dangerous.

**4.** In contrast, the level of intoxication of a person coupled with other behavioral indications could give rise to the suspicion of danger in other circumstances.

tion of statutory or constitutional protections, they should be placed in no better, but no worse, a position than they would have been had no impropriety occurred. *See Nix v. Williams,* 467 U.S. 431, 443, 104 S.Ct. 2501, 2508, 81 L.Ed.2d 377 (1984). The inevitable discovery doctrine exemplifies that balance. Whereas the exclusionary rule deprives the prosecution of evidence tainted by official wrongdoing and thereby discourages future improprieties, the inevitable discovery exception to the rule permits the introduction of evidence that eventually would have been located had there been no error, for that instance "there is no nexus sufficient to provide a taint." *Id.* at 448, 104 S.Ct. at 2511. Thus:

> If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means ... then the deterrence rationale has so little basis that the evidence should be received. Anything less would reject logic, experience, and common sense.

*Id.* at 444, 104 S.Ct. at 2509 (footnote omitted).

*U.S. v. Jones,* 72 F.3d 1324, 1330 (7th Cir. 1995).

Because the State asserts the applicability of the above doctrine, the relevant question becomes whether the police officers ultimately and legitimately would have discovered the weapon on Banks had he not been patted down prematurely. We have already noted that because a sobriety checkpoint is a lawful stop, *Maryland* indicates that the police were justified in requesting that not only the driver, but Banks and the other passenger, exit the car. As Banks and the front passenger obeyed the officers' legitimate request, Morgan saw a gun which was, by then, in plain view on the front floorboard of the car. Presumably, Morgan's view of the gun previously had been obstructed by the front passenger's feet, but was unobstructed when the front passenger left the car. Morgan testified that he saw this gun at the same moment (as opposed to after) Himmel announced that he had found a gun on Banks.

Thus, had there been no unjustified premature patdown of Banks, Morgan ultimately and legitimately would have seen the other gun in plain view on the floorboard after the front passenger exited. Having seen one gun in the car, it would then have been reasonable to believe that the other occupants might be presently armed and dangerous. At that point, a patdown search for weapons on each of the occupants would have been justified. During the legitimate patdown of Banks which would have ensued, his gun would have been found.

Under these circumstances, the deterrence rationale of the exclusionary rule has so little basis that the evidence of Banks's weapon should have been, and was, admitted. To decide otherwise would be to reject logic, experience, and common sense. Accordingly, the trial judge was well within his discretion in admitting into evidence the weapon found during the patdown search of Banks.

Affirmed.

SHARPNACK, C.J., and RILEY, J., concur.