Anthony T. **HERRON,** Appellant–Defendant,

v.

**STATE of Indiana,** Appellee–Plaintiff.

**No. 84A01–0304–CR–134.**

Court of Appeals of Indiana.

Jan. 16, 2004.

Robert D. Hepburn, Terre Haute, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Jodi Kathryn Stein, Deputy Attorney General, Indianapolis, IN, Attorney for Appellee.

## OPINION

MATHIAS, Judge.

Anthony Herron ("Herron") was convicted of Class A felony attempted murder[1] and Class A misdemeanor carrying a handgun without a license[2] in Vigo Superior Court. Herron appeals, raising the following dispositive, restated issues for review:

I. Whether the prosecutor violated Herron's Fifth Amendment privilege against compulsory self-incrimination; and,

II. Whether the trial court abused its discretion when it admitted testimony indicating a witness had been threatened as a result of the witness' decision to testify.

Concluding the trial court was within its discretion when it admitted testimony but the prosecutor violated Herron's privilege against compulsory self-incrimination, we reverse and remand.

## Facts and Procedural History

On April 16, 2002, Ray Rivera ("Rivera") was standing near the corner of 21st and Liberty Streets, Terre Haute, when he was shot with a nine-millimeter handgun. Rivera's survival of this incident largely can be attributed to the help of the following two "Good Samaritans."

Teaa Utley ("Utley") was in a house near the corner of 21st and Liberty Streets when she heard gunshots. After initially taking cover, Utley went outside to see if anyone was injured. When Utley noticed Rivera lying on the sidewalk, she administered assistance to him, kept him conscious, and had someone call an ambulance. While waiting for the ambulance, Utley asked Rivera who had shot him, but Rivera informed Utley that he did not know. Tr. p. 387.

Utley accompanied Rivera to the hospital. In the ambulance, Utley again asked Rivera who had shot him. Rivera mumbled something, but Utley was unable to understand what he had said. Tr. pp. 38–39. A couple of days after the shooting, Utley went to the hospital to see if Rivera was recovering. At this point, Rivera informed Utley that Herron was the person who had shot him. Tr. p. 40.

Phillip McCord ("McCord"), a Persian Gulf War veteran trained in administering emergency medical care, was in his backyard talking with his wife about their flowerbeds when he heard gunshots. After sending his wife in the house, McCord ran in the direction of the gunshots. As he

---

1. Ind.Code §§ 35–41–5–1 (1998); 35–42–1–1(1) (1998).

2. Ind.Code § 35–47–2–1 (1998).

was running, McCord saw Rivera "bobbing and weaving" in an evasive manner as Rivera was running from the shooter.

Due to the distance involved, McCord was unable to identify the shooter; however, McCord did notice that the shooter was a black male, was either bald or had very short hair, and had a black object in his hand that appeared to be a gun. Tr. pp. 71, 73. McCord also saw a green van pull up after the shooting and the shooter get into the van. Tr. p. 73. Aside from Rivera, the driver of the van, and the shooter, McCord did not indicate that he saw anyone near the shooting, and the shooter was the only person McCord saw get into the van. Tr. pp. 70–73.

On April 18, 2002, the State charged Herron by information with Class A felony attempted murder and Class A misdemeanor carrying a handgun without a license. A jury trial was held pursuant to these charges on February 10–12, 2002.

During trial, State witness Wendell Holman ("Holman") testified that on the day in question he, Herron, Terrell Herron ("Terrell"), and Rosa White ("White") were attending a barbecue when they decided to drive to a liquor store in a van to get some drinks. Tr. p. 95. Holman indicated that everyone in the van was carrying a handgun—including Herron, who was carrying a chrome .45–caliber semiautomatic handgun. Tr. pp. 103–05. Holman testified that after driving around for roughly an hour, Herron and Terrell stated that they were going to their mother's house and got out of the van. White then drove the van around the block and, after hearing gunshots, drove back to pick up Terrell and Herron. Tr. pp. 95, 107–08, 109–11.

White, who also testified for the State, indicated that, when Herron saw three people standing near the corner of 21st and Liberty Streets, Herron and Terrell

exited the van and told White to drive around the block. Tr. pp. 298–303. White indicated that after he had heard gunshots and had driven around the block, he saw Herron carrying a gun. Tr. pp. 306–07. White finally testified that Herron said "go, go" after Terrell and Herron got into the van. Tr. p. 307.

State witness Rachel Young ("Young") testified that she helped treat Rivera after he was brought to the hospital. Young's testimony indicated that, after thoroughly examining Rivera's body, she determined Rivera had been shot four times: a shot in his arm, armpit, thigh, and back. Tr. pp. 207–08.

State witness Detective Michele Barrett ("Detective Barrett") testified that she interviewed Rivera shortly after Rivera had been shot. In this interview, Rivera told Detective Barrett that Herron had shot him and described Herron as a black male with braids. Tr. pp. 333, 341.

The State also called Rivera as a witness. Rivera indicated that he was standing on the corner with two other people when Herron and Terrell stepped out of a van and the van parked across the street. Tr. p. 374. Rivera claimed that Herron approached him, accused him of being involved in the shooting of Herron's cousin, and then shot him several times. Tr. pp. 377–80. Rivera also testified that, as he was lying on the sidewalk after having been shot, Terrell stood over him and shot him in the stomach three additional times. Tr. p. 397.

The following exchange occurred during the prosecution's examination of Rivera:

STATE: Earlier, you told me that you had a question that you would like to ask TyRae [also known as Herron]. What is the question you would like to ask?

WITNESS: I'd like to ask TyRae—

DEFENSE: I'm going to object to the witness trying to interview the Defendant.

STATE: We're not expecting an answer. We're going to his state of mind after all this has happened your Honor. I think that that's within the province of the jury to hear.

DEFENSE: I'm going to have to ask that the Court consider instructing the State to refrain from these sorts of tactics.

COURT: I'm going to sustain the objection.

Tr. pp. 393–94. Also, during the State's closing rebuttal argument, the prosecutor stated, "but as for not presenting the gun to you, that actually fired those bullets, members of the jury, right over there at that table, that's the only one in the courtroom that can certainly tell us where that gun is." Tr. pp. 481–82.

After deliberations and giving a note to the judge suggesting that it was deadlocked, the jury found Herron guilty as charged. Ex. Vol. p. 60. The trial court sentenced Herron to thirty-years executed in the Department of Correction for his Class A felony attempted murder conviction and to a concurrent term of one-year executed in the Department of Correction for his Class A misdemeanor carrying a handgun without a license conviction. Herron now appeals.

## I. Privilege Against Compulsory Self–Incrimination

Herron claims that the prosecutor's remark of "but as for not presenting the gun to you, that actually fired those bullets, members of the jury, right over there at that table, that's the only one in the courtroom that can certainly tell us where that gun is" violated his Fifth Amendment privilege against compulsory self-incrimination.

■ A criminal defendant has a fundamental constitutional right to exercise his Fifth Amendment privilege against compulsory self-incrimination without adverse inference or comment at trial. *Reynolds v. State*, 797 N.E.2d 864, 869 (Ind.Ct.App.2003) (citing *Resnover v. State*, 507 N.E.2d 1382, 1388 (Ind.1987)). The Fifth Amendment privilege against compulsory self-incrimination is violated when a prosecutor makes a statement that is subject to reasonable interpretation by a jury as an invitation to draw an adverse inference from a defendant's silence. *Boatright v. State*, 759 N.E.2d 1038, 1043 (Ind.2001) (citing *Moore v. State*, 669 N.E.2d 733, 739 (Ind.1996)).

■ The State claims that Herron's failure to object to the prosecutor's comment waived his right to assert this issue on appeal. As a general rule, failure to object at trial results in waiver of an issue for purposes of appeal. *Boatright*, 759 N.E.2d at 1043 (citing *Isaacs v. State*, 673 N.E.2d 757, 763 (Ind.1996)). However, if adherence to the normal rules of appellate procedure would result in the waiver of an error which is so harmful that it operates to deny the appellant fundamental due process, an appellate court may "bypass those rules." *Reynolds*, 797 N.E.2d at 869 (quoting *Rogers v. State*, 272 Ind. 65, 73, 396 N.E.2d 348, 353 (1979)). Because we believe the prosecutor's statement amounted to just such fundamental error, we address Herron's claim despite his failure to object.

■ In addressing the merits of Herron's claim, the State contends that, though the prosecutor's comment can be misconstrued as a comment upon Herron's Fifth Amendment privilege against compulsory self-incrimination, the prosecutor's comment was proper because it was invited by Herron. Br. of Appellee at 8–10

(citing *Lopez v. State*, 527 N.E.2d 1119, 1125 (Ind.1988)). The State bases its assertion on Herron's closing argument, which stated, "It's just that they haven't found out where the gun is that shot him, and they've got a couple of witnesses that say that the gun that shot him, that they saw in the possession of Anthony, wasn't the right kind of gun." Tr. pp. 476–77.

■ A criminal defendant can invite the prosecution to comment upon his or her decision to invoke the Fifth Amendment privilege against compulsory self-incrimination. *U.S. v. Robinson*, 485 U.S. 25, 33–34, 108 S.Ct. 864, 99 L.Ed.2d 23 (1988) (defendant invited comment upon his silence when the defendant, who chose not to testify, argued to the jury that the State had denied him the opportunity to explain his side of the story during trial). Herron's statement was no such invitation; it was simply an assertion that the State failed to produce enough evidence to prove his guilt beyond a reasonable doubt.

Because the prosecutor's comment reasonably can be interpreted to suggest that it was Herron's invocation of his Fifth Amendment privilege against compulsory self-incrimination that prevented the State from producing the nine-millimeter handgun that shot Rivera, and this comment was not invited by Herron, Herron has met his burden of establishing a Fifth Amendment violation.

■ The State also contends the prosecutor's comment was harmless error. Because the comment upon a defendant's decision to invoke his Fifth Amendment privilege against compulsory self-incrimination is of a constitutional dimension, the State must satisfy the federal harmless error test in order to sustain Herron's conviction. *See Moore*, 669 N.E.2d at 736 (citing *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)). Under federal harmless error, we must presume that reversal is necessary until the State proves beyond a reasonable doubt that the prosecutor's error was harmless. *Id.*

The lone argument that the State offers to meet this burden is the claim that White and Rivera saw Herron shoot Rivera and whether Herron was the person who shot Rivera was the sole contested issue at trial. Br. of Appellee at 10.[3] This argument is insufficient for the State to satisfy its burden.[4]

McCord, as the Good Samaritan bystander with no apparent reason to fabricate his testimony, indicated the shooter acted alone, had a black gun, had little or

---

**3.** The State appears to mischaracterize the record with its claim that White saw Herron shoot Rivera. White testified that he did not recall seeing a gun while there were gunshots being fired; rather, he indicated that he saw Herron holding a gun after he heard the gunshots. Tr. p. 306. If Herron were not possibly with Terrell when Rivera was shot or if Rivera was shot by more than one type of gun, this clarification would be insignificant and unnecessary. However, because of the evidence indicating that (1) Terrell was carrying a gun, (2) Herron's gun was a chrome .45 caliber handgun, and (3) all of Rivera's wounds apparently came from a black nine-millimeter handgun, the State's mischaracterization cloaks the possibility that it was Terrell, rather than Herron, who shot Rivera.

**4.** The State's harmless error argument is confined to White and Rivera's observation of the shooting, and the State has failed to make an independent harmless error argument supporting Herron's carrying a handgun without a license conviction. There is considerably more—uncontradicted—evidence supporting this conviction. However, the State, as the party bearing the burden of proving harmless error, is required to present an argument in order to sustain this conviction. Because the State's harmless error argument does not support or address Herron's carrying a handgun without a license conviction, we also are forced to reverse this conviction and remand for retrial.

no hair, and got into the van—which pulled up after the shooting—alone. Tr. pp. 71, 73. The State witnesses identifying Herron as Rivera's shooter blatantly contradicted this testimony.

Holman indicated that Herron was carrying a chrome .45 caliber handgun—unlike the black nine-millimeter handgun that shot Rivera. Tr. p. 105. Holman also indicated that both Terrell and Herron were in the area of the shooting and both got into the van after the shooting. Tr. pp. 102, 111. Rivera indicated that the van parked across the street during the shooting—also contradicting Holman and White's testimony—and that Herron's hair was long enough to braid. Tr. pp. 333, 374. Finally, Holman, Rivera, and White indicated that both Terrell and Herron either took part in or were in the vicinity of the shooting. Tr. pp. 108, 302, 397.

Even aside from this contradictory testimony from others, there are many aspects of Rivera's own rendition of events that call his identification of Herron into question. Rivera testified that Terrell stood over him and fired three shots into his stomach after Herron had shot him; yet, the record makes perfectly clear that Rivera was not shot in the stomach during this incident. Tr. pp. 207–08, 397. Furthermore, Rivera initially informed Utley that he did not know who his shooter was. Tr. p. 387.

Because of the seriously contradictory testimony as to the shooter's identity, the fact that it does not appear that White saw Herron shoot Rivera, and the suspect nature of Rivera's implication of Herron, the State's argument is insufficient to satisfy its burden of establishing harmless error.[5] Accordingly, we must reverse Herron's convictions and remand for a new trial.

## II. The Admission of Testimony

■ Although we reverse Herron's convictions on the basis of the prosecutor's error, to expedite this issue should it arise again on remand, we address the trial court's decision to admit evidence of a witness receiving threats as a result of the witness' decision to testify.[6]

■ The evidentiary rulings of a trial court are afforded great deference on appeal and are reversed only upon a showing of an abuse of discretion. *Pavey v. State,* 764 N.E.2d 692, 705 (Ind.Ct.App.2002), *trans. denied.*

Herron objected to White's testimony that suggested he was being threatened as a result of his decision to testify.[7] Herron asserts the trial court abused its discretion when it allowed this testimony into evidence because the testimony does not tend to prove a material element of the case and unfairly prejudiced the jury by implying that he was responsible for the threats. Br. of Appellant at 11–12.

■ Generally, if a party touches incompletely on a subject, leaving the trier of fact with a false or misleading impression of the facts related, "the door may be

5. We are not contending there was insufficient evidence to support Herron's convictions. Were it not for the prosecutor's violation of Herron's Fifth Amendment rights, we would not need to examine conflicting testimony and consider witness credibility in order to determine the merits of the State's harmless error argument.

6. Herron also claimed that the prosecutor committed reversible error when he prompted Rivera to ask Herron a question during Rivera's direct examination. Because we anticipate that this question will not be repeated on remand, we choose not to address it for purposes of review. However, we strongly counsel the prosecutor to avoid inciting questions "he does not expect the defendant to answer" in the future.

7. A wheel fell off White's car on three separate occasions, one of White's cars was blown up, and White was heckled before testifying. Tr. pp. 328–29.

opened" to explore the subject more completely by bringing out the otherwise inadmissible material. *Pavey,* 764 N.E.2d at 705. Herron questioned the truthfulness of White's testimony by repeatedly referring to White's nervousness and asking why White had changed his earlier story. Tr. pp. 314–21. Thus, Herron's inquiry "opened the door" to the explanation as to why White had contrived his earlier story and looked nervous during testimony.

The trial court was therefore within its discretion when it admitted White's testimony concerning the alleged threatening conduct he was experiencing.

### Conclusion

The trial court was within its discretion when it admitted testimony indicating a witness had been threatened before trial. However, the prosecutor violated Herron's Fifth Amendment privilege against compulsory self-incrimination, and the State failed to meet its burden of establishing harmless error.

Reversed and remanded.

NAJAM, J., and ROBB, J., concur.