**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Aug 28 2014, 9:14 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**NICOLE A. ZELIN**
Pritzke & Davis
Greenfield, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**MONIKA PREKOPA TALBOT**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| DAVID K. ASIEDU, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 30A01-1311-CR-486 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE HANCOCK CIRCUIT COURT
The Honorable Richard D. Culver, Judge
Cause No. 30C01-1206-FD-911

**August 28, 2014**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**RILEY, Judge**

## STATEMENT OF THE CASE

Appellant-Defendant, David K. Asiedu (Asiedu), appeals his conviction for Count I, fraud, a Class D felony, Ind. Code § 35-43-5-4(1), Count II, theft, a Class D felony, I.C. § 35-43-4-2(a), and Count III, forgery, a Class C felony, I.C. § 35-43-5-2(b)(1).

We reverse and remand.

## ISSUE

Asiedu raises four issues, one of which we find dispositive and which we restate as: Whether the trial court abused its discretion by admitting certain evidence which was derivative of evidence obtained during an unlawful search and seizure.

## FACTS AND PROCEDURAL HISTORY

On May 31, 2012, at 12:46 a.m. and 12:47 a.m., two charges were made to a Discover Card at the Speedway[1] store located in Greenfield, Hancock County, Indiana (the Hancock County Transaction). The Discover Card belonged to Sarah Whitmer (Whitmer), who resides in New Holland, Pennsylvania.

That same day, at approximately 1:45 a.m., Whitestown Police Officer Nate Harves (Officer Harves) was dispatched to Love's Truck Stop in Boone County on a report that two individuals were attempting to purchase electronic tablets with a stolen credit card. After he arrived at the truck stop, Officer Harves detained the individuals, who were identified as Lawrence Gyamfi[2] (Gyamfi) and Asiedu. After obtaining

---

[1] Testimony indicates that Speedway was purchased by Gas America after the instant incident occurred. Because the testimony references the Speedway store, we will continue to refer to the Speedway store throughout this opinion.

[2] The trial court joined Asiedu's cause with co-defendant's, Lawrence Gyamfi, cause for trial. Both defendants were convicted and sentenced together but appealed separately.

Asiedu's consent, Officer Harves patted him down for weapons. He later searched the vehicle Gyamfi and Asiedu were using. In the vehicle, Officer Harves found several credit cards, and a receipt showing the Hancock County Transaction. Upon finding the receipt, Officer Harves contacted the Speedway store in Hancock County to inform it that the transaction might have involved a stolen credit card and to make a recording of the camera surveillance from around the time of the transaction.

At approximately 8:00 a.m., Officer Harves' shift ended; he informed Detective Scott Ralston of the Whitestown Police Department (Detective Ralston) of the arrest and handed him his report and further information, which contained his notes on the Hancock County Transaction. Officer Harves told Detective Ralston about the Hancock County Transaction and advised him to "check out the Speedway in Greenfield." (Transcript p. 68).

At some point between 8:00 a.m. and noon, following his conversation with Officer Harves, Detective Ralston contacted Speedway Corporate Security representative, Brian Seifert (Seifert), who pulled still shots of the Transaction from the surveillance footage. Also that same day, Detective Ralston contacted Discover Card investigator William McNally (McNally). During this conversation, McNally emailed Detective Ralston screen shots of the credit account related to the Hancock County Transaction. Detective Ralston noted that his decision to contact Discover Card and Speedway Corporate Security came about "as a result of the work that Officer Harves" had done. (Tr. p. 29). Following his call with Discover Card, Detective Ralston called the

3

management at the Speedway store in Hancock County and advised them "that they might want to report a crime." (Tr. p. 26).

Still that same day, May 31, 2012, Detective Ralston contacted Detective Trent Smoll of the Hancock County Sheriff's Department (Detective Smoll) to inform him of the case he was working on in Boone County. Detective Ralston forwarded "some information" to Detective Smoll "so he could continue with a case in [Hancock County.]" (Tr. p. 26). On June 6, 2012, Detective Smoll opened an investigation which resulted in charges, filed on June 26, 2012. At trial, Detective Smoll testified that all evidence presented in the Hancock County case was "all derived from those [] officers making the stop there in Boone County." (Tr. p. 37). Detective Smoll received all the evidence from Detective Ralston, who "pretty much informed [him] of everything." (Tr. p. 40). He admitted that he "really didn't get any more discovery or information on [his own]." (Tr. p. 41).

The Boone County prosecutor's office filed charges against Asiedu arising out of his arrest at the Love's Truck Stop. Following a hearing on Asiedu's motion to suppress, the Boone County trial court granted the motion and ordered "[e]vidence taken from the persons and the vehicles of [Asiedu] and [Gyamfi] [] suppressed." (State's Exh. 1). Thereafter, the Boone County trial court dismissed all charges arising out of the Boone County incident.

On June 26, 2012, the State filed an Information in the Hancock County Circuit Court, charging Asiedu with Count I, fraud, a Class D felony, I.C. § 35-43-5-4(1); and Count II, theft, a Class D felony, I.C. § 35-43-4-2(a). The State later amended the

4

Information by adding Count III, forgery, a Class C felony, I.C. § 35-43-5-2(b)(1). On November 19, 2012, Asiedu filed a motion to dismiss and for discharge, asserting that all of the State's evidence was derivatively gained as a result of information learned or leads obtained in the Boone County cause, which had been suppressed for violation of Asiedu's federal and state constitutional rights. On January 15, 2013, the trial court conducted a suppression hearing on Asiedu's motion. On February 13, 2013, the trial court denied the motion to suppress "as to all evidence with the exception of the evidence specifically suppressed" by the Boone County Superior Court. (Appellant's App. p. 5).

On September 10 through September 11, 2013, a jury trial was conducted. At the close of the evidence, the jury found Asiedu guilty as charged. On October 16, 2013, after a sentencing hearing, the trial court sentenced Asiedu to concurrent terms of four years on each Count.

Asiedu now appeals. Additional facts will be provided as necessary.

DISCUSSION AND DECISION

During the trial, the trial court admitted the surveillance video depicting the Hancock County Transaction and Whitmer's Discover Card statement. Contending that this admitted evidence was derivatively gained as a result of information or leads obtained during the unlawful search and seizure in Boone County, Asiedu maintains that the evidence amounts to fruit of the poisonous tree and therefore its admission violated his constitutional rights pursuant to the Fourth Amendment of the United States Constitution.

I. *Standard of Review*

5

The evidentiary rulings of a trial court are afforded great deference on appeal and are reversed only upon a showing of an abuse of discretion. *Herron v. State*, 801 N.E.2d 761, 768 (Ind. Ct. App. 2004). A claim of trial court error in admitting evidence may not be presented on appeal unless there is a timely trial objection "stating the specific ground of objection, if the specific ground was not apparent from the context." Ind. Evidence Rule 103(a)(1). Therefore, to preserve for appellate review a claimed error in the admission of evidence, a party must make a contemporaneous objection that is sufficiently specific to alert the trial court fully of the legal issue. *See Raess v. Doescher*, 883 N.E.2d 790, 797 (Ind. 2008).

At trial, the surveillance videotape was admitted over Asiedu's objection, who renewed the objections raised in his motion to suppress. However, although Asiedu objected to the admission of the Discover Card statement with respect to the relevancy of the charges "other than the Greenfield, Indiana on May 31" charge, Asiedu did not object that the statement was derivate of the unlawful search in Boone County.

As a general rule, failure to object at trial results in the waiver of an issue for purposes of appeal. *Herron v. State*, 801 N.E.2d 761, 765 (Ind. Ct. App. 2004). However, if adherence to the normal rules of appellate procedure would result in the waiver of an error which is so harmful that it operates to deny the appellant fundamental due process, an appellate court may "bypass those rules." *Id*. Insofar as Asiedu failed to properly object to the admission of the credit card statement, we will nevertheless address Asiedu's claim because we conclude that the error in the instant case amounts to just such a fundamental error.

## II.  *Fruit of the Poisonous Tree*

Asiedu contends that the trial court abused its discretion by admitting testimony and evidence which was derivatively gained as a result of information or leads obtained during the unlawful search and seizure in Boone County.  Asiedu maintains that the receipt establishing the Hancock County Transaction was discovered during Officer Harves' search of the vehicle.  As this search was declared illegal, all evidence obtained as a result thereof becomes fruit of the poisonous tree, and its admission by the trial court violated Asiedu's rights pursuant to the Fourth Amendment of the United States Constitution.[3]

The Fourth Amendment to the U.S. Constitution protects persons from unreasonable search and seizure by prohibiting, as a general rule, searches and seizures conducted without a warrant supported by probable cause.  U.S. Const. amend. IV.  As a deterrent mechanism, evidence obtained in violation of this rule is generally not admissible in a prosecution against the victim of the unlawful search or seizure absent evidence of a recognized exception.  *Mapp v. Ohio*, 367 U.S. 643, 649-55, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).  Therefore, evidence obtained pursuant to an unlawful seizure must be excluded under the fruit of the poisonous tree doctrine.  *Sanchez v. State*, 803 N.E.2d 215, 221 (Ind. Ct. App. 2004), *trans. denied*. This extension of the exclusionary rule bars evidence directly obtained by the illegal search or seizure as well as evidence

---

[3] Although Asiedu asserts that his rights pursuant to the Fourth Amendment and Article 1, Section 11 of the Indiana Constitution were violated, he omits to make a separate analysis under the Indiana Constitution and all case law relied upon pertains to the Fourth Amendment of the United States Constitution.

7

derivatively gained as a result of information learned or leads obtained during that same search or seizure. *Id*.

Nonetheless, the United States Supreme Court has refused to adopt a "but for" rule, making inadmissible any and all evidence which comes to light through a chain of events beginning with an illegal stop or arrest. *Id.* Rather, the Court stated, "the more apt question in such a case is whether, granting establishment of the primary illegality, the evidence to which the instant objection is made has been come at by the exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Id*. (citing *Wong Sun v. U.S.*, 371 U.S. 471, 487-88, 83 S.Ct. 407, 93 L.Ed.2d 441 (1963)). Evidence may be purged of the primary taint if the causal connection between the illegal police conduct and the procurement of the evidence is so attenuated as to dissipate the taint of the illegal action. *Sanchez*, 803 N.E.2d at 221. In making this determination under the Fourth Amendment, courts generally consider "(1) the time elapsed between the illegality and the acquisition of the evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct." *Id*. Thus, in summary, the defendant must first prove the Fourth Amendment violation and that the evidence was a "fruit" of that search; the State must then show that the evidence may nevertheless be admitted. *Clark v. State*, 994 N.E.2d 252, 266 (Ind. 2013).

It is undisputed that the surveillance video and credit card statement were derivatively gained as a result of information learned or leads obtained during the illegal search in Boone County. During the search of the vehicle by Officer Harves in Boone

County, the officer discovered a receipt showing the Hancock County Transaction. Information derived from the receipt prompted Officer Harves to contact the Speedway store in Hancock County and to request a copy of the camera surveillance footage of the Transaction. In continuation of the investigation, Officer Harves gave all the information to Detective Ralston and told him specifically to "check out the Speedway." (Tr. p. 35). Still that same day, Detective Ralston contacted McNally at Discover Card and Seifert at Speedway Corporate Security. Later that day, Detective Ralston contacted Detective Smoll in Hancock County to apprise him of possible charges in Hancock County. After receipt of the information, Detective Smoll did not conduct any further investigatory inquiries.

Moreover, we cannot conclude that the causal chain is sufficiently attenuated to dissipate any taint of the illegal search. *See Wong Sun*, 371 U.S. at 487-88, 83 S.Ct. 407. The time lapse between the illegality and the acquisition of the evidence is almost insignificant as all major investigatory inquiries occurred within the same 24-hour time period. Officer Harves testified that, while on scene at the Love's Truck Stop in Boone County, he contacted the Speedway in Hancock County requesting the surveillance footage from around the time of the Hancock County Transaction. At approximately 8:00 a.m., Officer Harves' shift ended; he informed Detective Ralston of the arrest and handed him his report and further information. At some point between 8:00 a.m. and noon, following his conversation with Officer Harves, Detective Ralston contacted Seifert with Speedway Corporate Security and McNally with Discover Card. Both

9

emailed Detective Ralston information pertaining to Whitmer's credit card. Looking at possible intervening circumstances, we discern none, nor does the State assert any.

Turning to the third factor—the purpose and flagrancy of the official misconduct—the State argues that "[t]he purpose of any official misconduct here was a legitimate one: it was an attempt to stop sophisticated and hard-to-catch criminals from committing crimes that affect most people living in modern society." (State's Br. p. 17). We disagree with the State's reasoning. As testified by Officer Harves, the purpose of the investigation and the vehicle search was to investigate "possible credit card fraud." (Tr. p. 68). During this illegal search, Officer Harves located the receipt which constitutes the basis for the ensuing investigation in the Hancock County Transaction and the subsequent charges. Because the primary purpose of the exclusionary rule is to discourage police misconduct, the admission of the surveillance footage and credit card statement would not serve this deterrent function as the police action here benefitted the Hancock County investigation at the expense of the suspect's protected rights. *See Quinn v. State*, 792 N.E.2d 597, 602 (Ind. Ct. App. 2003) (where we affirmed the trial court's admission of the contested evidence because the officers had knowledge of an outstanding warrant for Quinn's arrest prior to the illegal stop of his vehicle. Because the purpose of the stop was not intended to exploit Quinn's Fourth Amendment rights, suppressing the evidence obtained pursuant to the lawful arrest would have minimal deterrent effect on illegal police behavior), *trans. denied*. As such, the taint of the illegal search is not dissipated.

However, in addition to the attenuation exception to dissipate the taint of the illegal action, the fruit of the poisonous tree doctrine also does not apply when the derivative evidence was obtained via an independent source or when the challenged evidence would inevitably have been properly obtained. *See Wong Sun*, 371 U.S. at 485; *Nix v. Williams*, 467 U.S. 431, 443-44, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984).

Although the State acknowledges that evidence obtained as fruit of the poisonous tree can be admitted if the derivative evidence obtained has an independent source, the State fails to present an argument or point to any evidence supporting this exception.[4]

Turning to the inevitable discovery exception, the State focuses on Whitmer's testimony that she checks her monthly credit card statement and would have reported the unauthorized charges to Discover Card and the police, whereupon Discover Card and the police would have conducted an investigation similar to the one before us. The evidence reflects that Detective Ralston notified Discover Card that Whitmer's credit card had been compromised. Thus, at the time Asiedu was under arrest in Boone County, Discover Card—and presumably Whitmer—were not yet aware of the fraud and no fraud investigation had been opened. Furthermore, Detective Smoll testified that Speedway only preserves "three months of transaction history and digital recorded evidence." (Tr. p. 45). Therefore, depending on when the fraud would have been discovered and reported, surveillance footage might no longer be available thereby making identification of Asiedu as the perpetrator more difficult. Moreover, even if footage would be

---

[4] Although the State asserts that "[t]he only evidence admitted here was that found pursuant to Detective Ralston's investigation," this statement was made with respect to the State's analysis of the reasonableness of a search under Article 1, Section 11 of the Indiana Constitution.

11

available, it is very speculative whether Asiedu could have been identified and located. Accordingly, the inevitable discovery doctrine is not available to validate the admission of evidence obtained as a result of the illegal search.

In sum, because the contested evidence was obtained as an immediate result of Officer Harves' illegal search, the evidence amounted to fruit of the poisonous tree and the trial court abused its discretion by admitting it pursuant to the Fourth Amendment of the United States Constitution.

CONCLUSION

Based on the foregoing, we conclude that the trial court abused its discretion by admitting the contested evidence which amounted to fruit of the poisonous tree pursuant to the Fourth Amendment of the United States Constitution.

Reversed and remanded.

PYLE, J. concurs

FRIEDLANDER, J. dissents with separate opinion

# IN THE
# COURT OF APPEALS OF INDIANA

DAVID K. ASIEDU       )
             )
 Appellant-Defendant,    )
             )
    vs.        )   No. 30A01-1311-CR-486
             )
STATE OF INDIANA      )
             )
 Appellee-Plaintiff.     )
             )

**FRIEDLANDER, Judge, dissenting**

I believe the inevitable discovery exception applies here and, pursuant to that doctrine, the evidence supporting Asiedu's conviction was admissible, notwithstanding the illegal search in Boone County. Therefore, I would affirm Asiedu's convictions and respectfully dissent from the majority's conclusion to the contrary.

I agree with the majority's observation that Asiedu fails to offer a separate analysis of this issue under the Indiana Constitution. Although he quotes from Indiana cases, the material quoted consists of analysis under the Fourth Amendment of the Federal Constitution. Therefore, he has waived any argument pertaining to article 1 section 11 of the Indiana Constitution. *See Myers v. State*, 839 N.E.2d 1154 (Ind. 2005)

13

(where a party cites the Indiana Constitution but presents no separate argument specifically treating and analyzing a claim under that provision distinct from its federal counterpart, we resolve the claim only on the basis of federal constitutional doctrine), *cert. denied*, 547 U.S. 1148 (2006); *see also Patterson v. State*, 958 N.E.2d 478, 488 (Ind. Ct. App. 2011) (assertion of a violation of article 1 section 11 not accompanied by "independent analysis supporting a separate standard under the Indiana Constitution" results in a waiver of any state constitutional claim).

I first observe that Asiedu has waived any error that occurred with respect to introduction of the victim's credit-card statement in contravention of the Fourth Amendment. Although Asiedu frames the issue as an alleged error in the denial of his pretrial motion to suppress, this matter culminated in a trial at which said evidence was introduced. "Thus, the issue is ... appropriately framed as whether the trial court abused its discretion by admitting the evidence at trial." *Collins v. State*, 822 N.E.2d 214, 218 (Ind. Ct. App. 2005) (quoting *Washington v. State,* 784 N.E.2d 584, 587 (Ind. Ct. App. 2003)), *trans. denied*. At trial, Asiedu objected to the credit-card statement only on the basis that it reflected other credit-card charges that were irrelevant to this prosecution. "It is well-settled law in Indiana that a defendant may not argue one ground for objection at trial and then raise new grounds on appeal." *Turner v. State*, 953 N.E.2d 1039, 1058 (Ind. 2011) (quoting *Gill v. State,* 730 N.E.2d 709, 711 (Ind. 2000)). Moreover, Asiedu does not frame his challenge to this evidence in terms of fundamental error. Therefore, this claim is not properly before us. *See Turner v. State*, 953 N.E.2d 1039.

Turning now to the Speedway store surveillance video, Asiedu objected to its admission via the "fruit of the poisonous tree" doctrine. The State argued that the evidence was admissible under the inevitable discovery exception to the exclusionary rule. "The inevitable discovery exception to the exclusionary rule permits the introduction of evidence that eventually would have been located had there been no error." *Shultz v. State,* 742 N.E.2d 961, 965 (Ind. Ct. App. 2011) (internal quotations omitted), *trans. denied.* Pursuant to this exception, "if the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means … then … the evidence should be received." *Banks v. State,* 681 N.E.2d 235, 240 (Ind. Ct. App. 1997) (internal quotation omitted). This exception exists because, without it, exclusion of the derivative evidence "'would put the police in a position worse than they would have been in absent any error or violation' and the deterrence basis of the exclusionary rule would be lost." *Clark v. State*, 994 N.E.2d 252, 272 (Ind. 2013) (quoting *Nix v. Williams.* 467 U.S. 431, 443–44, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984)).

In two transactions on the stolen Discover card of the victim, Sarah Jane Whitmer, Asiedu charged a total of $741.65. Whitmer testified that she received a paper credit card statement each month and that she reviewed it carefully. She testified that she would have known each charge she made and would have reported to the police unauthorized charges. Therefore, there was evidence that Whitmer would have discovered Asiedu's unauthorized charges when she received her next billing statement and would have reported this to Discover Card. It may reasonably be inferred that this would have

15

initiated a criminal investigation. Would this have inevitably lead to the discovery of the surveillance video? The majority concludes that it would not, primarily because at the time the fraud was discovered by Whitmer, the surveillance footage might no longer be available. This, in turn, is based upon evidence that Speedway preserves such footage only for three months. It is common knowledge that credit card companies mail statements on a monthly basis. Therefore, even assuming these fraudulent transactions were made on the first day of a billing cycle, the longest period of time that would have elapsed before a billing statement reflecting that activity was mailed to Whitmer would have been one month, plus the few days it would have taken to receive the mailed statement. This would have been well within the three-month period that the May 31, 2012 transactions would have been preserved on Speedway's surveillance system. I also disagree with the majority's observation that "even if footage would be available, it is very speculative whether Asiedu could have been identified and located." Slip op at 12. A review of the digital media in question reveals that both Asiedu and his confederate, Lawrence Gyamfi, were clearly visible for approximately two minutes as these transactions were completed at the store counter. The digital images are easily of sufficient quality to render it possible, and even likely, to make a positive identification of the individuals from that footage alone. Accordingly, I believe the State proved by a preponderance of the evidence that the videotape would inevitably have been discovered even without the tainted information.

Finally, I note that Asiedu presents two other issues that the majority does not address by virtue of its reversal on the suppression issue. In the first, Asiedu contends

16

that the surveillance video was not admissible because the State did not lay a proper foundation. In the second, Asiedu contends that the sentence he received was inappropriate. I will not undertake a detailed analysis of those issues in light of the fact that the majority reverses on a separate issue. It is enough to say that, with respect to the first, the State presented evidence sufficient to authenticate the surveillance video through the testimony of Speedway corporate fraud investigator Brian Seifert. Seifert's testimony also was sufficient to establish a proper chain of custody.

As to the second issue, the State concedes that trial court erred in sentencing Asiedu to four years on each of his class D felony convictions. At the time Asiedu committed these offenses, the maximum allowable sentence for a class D felony was three years. Thus, the sentences for each class D felony exceeded the maximum allowable sentence. I note, however, that Asiedu also received a sentence of four years for his class C felony conviction, which was the advisory sentence for a conviction of that classification. Also, the trial court ordered all sentences to be served concurrently, for a total executed sentence of four years. Therefore, I would remand to the trial court to correct the sentences for the two class D felonies and impose sentences that are within the allowable range. This would presumably not alter Asiedu's executed sentence, however, because the four-year sentence imposed for the class C felony remains unchanged. My review convinces me that a four-year sentence is not inappropriate given Asiedu's character and the nature of his offenses.

I would remand with instructions to correct the sentences imposed for the two class D felonies, but would affirm the trial court in all other respects.