## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Feb 28 2019, 10:15 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Matthew J. McGovern
Anderson, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

Lyubov Gore
Deputy Attorney General
Indianapolis, Indiana

IN THE

# COURT OF APPEALS OF INDIANA

David Ashby,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

February 28, 2019

Court of Appeals Case No.
18A-CR-1200

Appeal from the Floyd Superior
Court

The Honorable Susan L. Orth,
Judge

Trial Court Cause No.
22D01-1705-F2-980

**Crone, Judge.**

## Case Summary

[1] A jury found David Ashby guilty of level 2 felony burglary involving the use of a deadly weapon. He now appeals his conviction, challenging the admission of certain evidence and claiming that the deputy prosecutor committed misconduct during closing argument. He also asserts that his thirty-year sentence is inappropriate in light of the nature of the offense and his character. Finding that Ashby has failed to establish reversible error in either the admission of evidence or the deputy prosecutor's conduct, we affirm his conviction. Finding that he has failed to meet his burden of demonstrating that his sentence is inappropriate, we also affirm his sentence.

## Facts and Procedural History

[2] In the early 2000s, Ashby was living at a halfway house affiliated with Catholic Charities. Ron Kelly worked in maintenance for Catholic Charities, and as part of his employment, he supervised crews of residents from the halfway house in performing maintenance and handyman services at several Catholic churches in the area. Ashby was one of those crew workers, and over the next four years, he became one of Ron's best workers. The two also became good friends, and Ashby helped Ron with projects and chores at Ron's rural home. Ashby performed tasks such as lawn mowing, moving furniture, and hanging Christmas lights. At some point during the dozen or so times that Ashby visited Ron's residence, he saw Ron put large sums of cash inside the coin boxes of arcade games in his basement. He also became aware of a large safe in

the master bedroom in which Ron and his wife Tina kept firearms, cash, and other valuables.

[3] During his time at the halfway house, Ashby met Stephen Blakley. He later helped Blakley get a job with the construction company where he worked. In 2016, Ashby and Blakley needed money to repay some drug debts, and Ashby recalled the valuables he had seen at the Kellys' house. The two men conferred about robbing the Kellys, and Blakley suggested that they approach Brandon Langley about helping them commit the home invasion. Because the Kellys' property was rural and difficult to locate, Ashby drove Blakley to the property. He also ensured that Blakley and Langley knew the locations of the safe, cash, silver, firearms, and other valuable personal property within the Kellys' home. Blakley and Langley drove to the Kellys' home a couple times but did not complete the home invasion because the Kellys were not home and thus could not provide the necessary keys and/or combinations.

[4] In the predawn hours of July 20, 2016, the Kellys' neighbor David Herbst saw a white pickup truck on the side of the road near the Kellys' home. The engine was running, and the driver (Blakley) could not be seen. Herbst observed the pickup for about five minutes. As the pickup pulled away and turned down a long driveway, Herbst photographed its back end, began to follow it, and phoned 911 to report a suspicious vehicle.

[5] Shortly thereafter, as Tina was pulling out of her long driveway to go to work, she heard a loud thump on the back of her vehicle, she turned and saw a

masked man dressed in tactical gear and carrying a handgun. That man, later identified as Langley, approached the driver's side window and ordered Tina to move to the passenger's seat. He told her that he intended to go inside to the safe and the arcade games in her basement. He entered the vehicle and drove it back into the garage. He ordered Tina into the house, and Tina woke Ron, who was sleeping on the living room couch. Langley pointed his firearm at Ron's head and ordered him up. He searched the buffet and found an envelope full of cash. He continued to rifle through the buffet, muttering something about "silver" and saying, "Well, somebody lied to me." Tr. Vol. 2 at 92. Meanwhile, Ron unsuccessfully feigned a heart attack in an effort to reach a firearm that he kept hidden nearby. Langley pulled him up and demanded that he and Tina lead him to the safe in the bedroom.

[6] In the bedroom, Langley forced the Kellys to sit on the bed and ordered Tina to provide the combination to the large gun safe and the key to a lockbox within the safe. Ron attempted to reach toward the nightstand, where he typically kept a firearm, and Langley struck him in the forehead with the barrel of his handgun. Ron bled profusely, and Tina used some clothing to apply pressure to the wound. Langley emptied the safe and lockbox, collecting six firearms, jewelry, savings bonds, heirlooms, a coin collection, and at least $30,000 in cash, and stuffed them into pillowcases. He also took Tina's wedding ring from her finger.

[7] Langley then forced the Kellys into the basement, where he demanded the cash that he had been told they kept inside the coin boxes of the arcade games. The

boxes were empty. Furious, Langley said that he wanted more money and jewelry. He then turned his attention toward two televisions that he had been told to take, but they were too heavy. He took two laptop computers from upstairs and forced Tina to help him carry the contraband to her vehicle. He told her that he would leave her vehicle within a mile of her house, and he took Ron's truck keys and slashed the tires of their son's vehicle. He took the Kellys' cell phones and house phones and drove away in Tina's vehicle. Tina used an overlooked house phone to call 911. Police responding to the call determined that the home invasion was targeted by a person with knowledge not readily available to the public.

[8] Later that day, Blakley notified Ashby that he and Langley had completed the home invasion and had gotten money and other items. The two met, and Blakley gave Ashby a one-third share of the spoils. Three days later, police located Tina's vehicle in a wooded ditch not far from their home. Ashby subsequently sold the coin collection and jewelry to a contact named Charles Sparkman ("Sparky") and divided the proceeds three ways. Shortly thereafter, Langley committed suicide.

[9] Several months later, Ron notified police concerning a letter he received from a jail inmate offering information about the home invasion in exchange for $10,000. Floyd County Sheriff's Department Detective Mark Slaughter investigated and traced the letter to Blakley. He interviewed Blakley, who provided specific information concerning the home invasion and Ashby's role in it. Detective Slaughter subsequently interviewed Ashby, who confessed to

his involvement and provided detailed information concerning his sale to Sparky.

[10] The State charged Ashby with level 2 felony robbery resulting in serious bodily injury. Ashby filed motions in limine seeking to exclude statements that he made to Detective Slaughter concerning his prior drug use and halfway house residency, as well as certain statements that Blakley made to the detective. The trial court conducted a hearing on Ashby's motions and granted the motions in part as to Ashby's own statements and ordered certain redactions to the videotaped interview. The court otherwise denied the motions, with the stated intention of ruling on the remainder of the challenged evidence when offered during Ashby's jury trial.

[11] The State amended the information to add one count of level 2 felony burglary involving the use of a deadly weapon and to downgrade the robbery count to a level 3 felony. A jury found Ashby guilty of level 2 felony burglary involving the use of a deadly weapon and not guilty on the robbery count. The trial court sentenced him to a thirty-year executed term. Ashby now appeals his conviction and sentence. Additional facts will be provided as necessary.

## Discussion and Decision

## Section 1 – The trial court acted within its discretion in admitting evidence concerning Ashby's drug use.

[12] Ashby challenges the trial court's admission of statements that he made to Detective Slaughter related to his drug use. We review evidentiary rulings for

an abuse of discretion resulting in prejudicial error. *Williams v. State*, 43 N.E.3d 578, 581 (Ind. 2015). An abuse of discretion occurs when the trial court's ruling is either clearly against the logic and effect of the facts and circumstances before it or the court misinterprets the law. *Id*. In determining whether improperly admitted evidence has prejudiced the defendant, we assess the probable impact of that evidence on the jury in light of all the other properly admitted evidence. *Id*. If independent, properly admitted evidence of guilt supports the conviction, the error is harmless. *Id*.

[13] Ashby claims that evidence concerning his drug use is inadmissible as evidence of prior bad acts. The trial court addressed this issue during the hearing on Ashby's motions in limine and ordered certain redactions to his videotaped statement. During his trial, Ashby renewed his objection to unredacted statements related to his drug use. Indiana Evidence Rule 404(b) reads,

> (b) Crimes, Wrongs, or Other Acts.
>
> (1) Prohibited Uses. Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.
>
> (2) Permitted Uses; Notice in a Criminal Case. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. On request by a defendant in a criminal case, the prosecutor must:

(A) provide reasonable notice of the general nature of any such evidence that the prosecutor intends to offer at trial; and

(B) do so before trial—or during trial if the court, for good cause, excuses lack of pretrial notice.

In assessing the admissibility of Rule 404(b) evidence, the trial court must (1) determine that the evidence of other crimes, wrongs, or acts is relevant to a matter at issue other than the defendant's propensity to commit the charged act; and (2) balance the probative value of the evidence against its prejudicial effect pursuant to Indiana Evidence Rule 403. *Luke v. State*, 51 N.E.3d 401, 416 (Ind. Ct. App. 2016), *trans. denied*. Rule 403 states, "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence."

[14] Ashby claims that the trial court improperly admitted evidence that he owed a sizable debt related to his use of methamphetamine. The State did not offer the evidence to show *that* Ashby participated in the burglary; rather, it offered the evidence to show *why* he participated in the burglary. In other words, the evidence addressed his motive, which is a permitted use under Rule 404(b)(2). Ashby needed money immediately because he had a substantial drug-related debt of approximately $7400; he planned the home invasion to obtain large sums of money to pay that debt. Such was the extent of the evidence presented on the topic of his drug use, as the State redacted from Ashby's statement all other information concerning his propensity to commit criminal acts. The high

probative value of the drug-debt evidence, used to establish motive, was not substantially outweighed by a danger of unfair prejudice. Thus, the trial court acted within its discretion in admitting the evidence.

## Section 2 – Ashby failed to demonstrate fundamental error in the trial court's admission of his former residency at a halfway house.

[15] Ashby also maintains that the trial court abused its discretion in admitting his statements to Detective Slaughter concerning his former residency at a halfway house. Although he now challenges the admissibility of the evidence on Rule 404(b) grounds, he failed to object when the halfway house information was introduced during trial and must therefore establish fundamental error. Fundamental error is an extremely narrow exception to the waiver rule and exists only where the trial court's errors are so prejudicial that they make a fair trial impossible. *Ryan v. State*, 9 N.E.3d 663, 668 (Ind. 2014).

[16] With respect the halfway house evidence, we note that the State did not offer it to show that Ashby had a propensity to commit burglary. Instead, the State offered the evidence to establish knowledge, identity, and plan, all acceptable uses under Rule 404(b)(2). Ashby's residency at the halfway house was more of a status than a prior bad act, but to the extent that it implicates some kind of prior bad act, we note that it was highly probative in giving context to Ashby's relationships with Ron and Blakley, both of whom he met because of his residency there. The blossoming friendship between Ashby and Ron had its roots in Ashby's community service work that he performed as a member of

Ron's maintenance crew. The friendship precipitated the invitations to the Kellys' home, where Ashby learned both the extent and the locations of their various valuables. Investigators readily determined that the home invasion had been targeted, and this evidence is highly probative on this issue. The State did not belabor the circumstances surrounding Ashby's residency at the halfway house but merely used it to corroborate other evidence establishing identity, knowledge, and plan. Thus, the danger of unfair prejudice was substantially outweighed by the probative value of this evidence. Based on the foregoing, we find no error, fundamental or otherwise, in the trial court's admission of this evidence.

## Section 3 – We find no reversible error in the trial court's admission of statements made to police by out-of-court declarants.

[17] Ashby also claims that the trial court abused its discretion in admitting Detective Slaughter's testimony concerning Blakley's and Sparky's statements to him regarding Ashby's participation in the burglary and possession of contraband, respectively. He asserts that the statements are inadmissible on hearsay grounds. *See* Ind. Evidence Rule 802 ("Hearsay is not admissible unless these rules or other lase provides otherwise."); *see also Harrison v. State*, 32 N.E.3d 240, 254 (Ind. Ct. App. 2015) (hearsay is generally inadmissible), *trans. denied*. Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. Ind. Evidence Rule 801(c). "The erroneous admission of

hearsay testimony does not require reversal unless it prejudices the defendant's substantial rights." *Blount v. State*, 22 N.E.3d 559, 564 (Ind. 2014).

[18] Noting that neither Blakley nor Sparky testified at trial, Ashby asserts that their statements, as relayed by Detective Slaughter, are inadmissible hearsay and their admission violated his constitutional rights to confrontation and cross-examination. The State counters that Detective Slaughter's testimony, placed in context, was not offered for the truth of the matters that Blakley and Sparky asserted but merely reflects a narrative concerning the detective's course of investigation of the crime. "Out-of-court statements made to law enforcement are non-hearsay if introduced primarily to explain why the investigation proceeded as it did." *Id.* at 565.

[19] With respect to Blakley, Ashby challenges Detective Slaughter's testimony that Blakley willingly "identified other individuals that were involved in the robbery," and that "there was some lead information … that identified … Ashby as … one of the individuals that was involved … initially." Tr. Vol. 2 at 154. The detective explained that "[Blakley] mentioned Ashby, he mentioned himself, and an individual with the last name of Langley." *Id.* He also testified that "Blakley had provided a [nick]name of an individual of where the stolen coins and jewelry were sold." *Id.* The detective explained his methods of pursuing leads and corroborating Blakley's assertions through independent investigation, e.g., Langley's suicide a couple months after the Kelly home invasion and the sale of certain coins and specific pieces of jewelry to Sparky,

who had a booth at the Shepherdsville, Kentucky, Flea Market. Tr. Vol. 2 at 155-57.

[20] Blakley's statements prompted Detective Slaughter to contact the flea market to corroborate Sparky's existence and determine his actual identity. This information led to an interview of Sparky at his home. Sparky indicated that of Blakley, Langley, and Ashby, he knew only Ashby. He also confirmed that he purchased jewelry and coins from Ashby for seven to eight thousand dollars total. *Id*. at 158-59. The detective followed up on the information provided by Sparky and found specific jewelry items and coins stolen from the Kellys, which Sparky had sold to Louisville Numismatic. *Id*. at 159-60.

[21] Ashby specifically challenges Sparky's statement to Detective Slaughter confirming that he bought the coins and jewelry from Ashby. As with Blakley's statements, Ashby challenges those of Sparky's statements that he claims implicate him as part of the Kelly home invasion, and the State contends that the statements are not hearsay because they explain the detective's course of investigation.

[22] When the State offers evidence to explain an officer's course of investigation, "[t]he ultimate inquiry is: Was the out-of-court statement used primarily to show the truth of its content, constituting inadmissible hearsay, or merely to explain subsequent police action, excluded from hearsay?" *Blount*, 22 N.E.3d at 566. "The possibility [that] the jury may wonder why police pursued a particular path does not, without more, make course-of-investigation testimony

relevant. Indeed, such testimony is of little value absent a direct challenge to the legitimacy of the investigation." *Id*. at 565 (citation omitted).

[23] In *Craig v. State*, 630 N.E.2d 207, 211 (Ind. 1994), our supreme court articulated the following three-part test to make such determinations:

> 1. Does the testimony or written evidence describe an out-of-court statement asserting a fact susceptible of being true or false?
>
> If the statement contains no such assertion, it cannot be hearsay and the objection should be overruled. If the out-of-court statement does contain an assertion of fact, then the Court should consider the following before ruling:
>
> 2. What is the evidentiary purpose of the proffered statement?
>
> .... If the evidentiary purpose is to prove a fact asserted, and such purpose is not approved under Evid. R. 801(d),[1] then the hearsay objection should be sustained, unless the statement fits an exception to the hearsay rule.
>
> If the proponent of the statement urges a purpose other than to prove a fact which is asserted, then the Court should consider the following before ruling:
>
> 3. Is the fact to be proved under the suggested purpose for the statement relevant to some issue in the case, and does any danger of prejudice outweigh its probative value?

---

[1] Indiana Evidence Rule 801(d) lists statements that are not hearsay, e.g., certain statements by a declarant-witness or an opposing party.

.... If the fact sought to be proved under the suggested non-hearsay purpose is not relevant, or it is relevant but its danger of unfair prejudice substantially outweighs its probative value, the hearsay objection should be sustained.

*Blount*, 22 N.E.3d at 566-67 (quoting *Craig*, 630 N.E.2d at 211).

[24] Here, Blakley's statement implicated Ashby as being involved in the Kelly home invasion, and Sparky's statement implicated Ashby as the person who sold him the coins and jewelry eventually determined to belong to the Kellys. These statements were susceptible of being true or false. As for the evidentiary purpose of the statements, the State asserts that it offered the statements merely to explain the detective's course of investigation, not for the truth of the matter asserted. Because the State suggested a non-hearsay purpose, we must determine whether the probative value of the statements is substantially outweighed by the danger of unfair prejudice. The challenged statements answered the question as to how Detective Slaughter connected the dots to Ashby's involvement in the crime. The legitimacy of Detective Slaughter's investigation was not in issue, and as such, the danger of unfair prejudice from Blakley's and Sparky's statements as to Ashby's involvement substantially outweighed the probative value as to the investigation. Without some "reasonable level of assurance" that the jury did not consider the statements as evidence of the truth of the matter asserted, such as through an "immediate limiting instruction from the court …. we cannot be sure that they were considered only for their urged non-hearsay purpose." *Blount*, 22 N.E.3d at 568 (citing *Williams v. State*, 544 N.E.2d 161, 162-63 (Ind. 1989)). Having no such

assurance here, we conclude that the trial court abused its discretion in admitting Detective Slaughter's testimony concerning Blakley's and Sparky's statements.

[25] Notwithstanding, a violation of the right to confront and cross-examine witnesses does not require reversal if the State can show beyond a reasonable doubt that the error did not contribute to the verdict. *Koenig v. State*, 933 N.E.2d 1271, 1273 (Ind. 2010). This harmless error analysis requires consideration of factors such as the importance of the testimony to the State's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony on material points, the extent of cross-examination otherwise permitted, and the overall strength of the State's case. *Id*. (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1974)).

[26] Ron and Tina testified in detail concerning the home invasion, including the masked perpetrator's intimate and specific knowledge of the nature, extent, and location of specific valuables. Ron testified that Ashby had spent time in his home and was aware of the location of the safe and of his practice of stashing money in the coin boxes of his arcade games in the basement. Responding officer Thad Neafus testified that he believed the Kelly home had been targeted by someone with knowledge not available to the general public. Ron's daughter Tiffany testified concerning an encounter with Ashby before the home invasion, pursuant to which Ashby became aware that her parents were still living at the home that he had previously visited. Detective Slaughter provided extensive information not linked to the improperly admitted statements

independently corroborating Ashby's guilt. Most significantly, Ashby's confession included in-depth information concerning his motive and level of involvement in the home invasion. State's Ex. 100. Based on the foregoing, we conclude that Ashby's conviction is sufficiently supported by independent evidence of guilt such that the improperly admitted hearsay statements did not contribute to the jury's verdict. We therefore find no reversible error in the improper admission of the challenged statements.

## Section 4 – Ashby has failed to establish fundamental error concerning the deputy prosecutor's statements during closing argument.

Ashby also maintains that he is entitled to reversal due to alleged prosecutorial misconduct during closing argument.

> In reviewing a claim of prosecutorial misconduct properly raised in the trial court, we determine (1) whether misconduct occurred, and if so, (2) whether the misconduct, under all of the circumstances, placed the defendant in a position of grave peril to which he or she would not have been subjected otherwise. A prosecutor has the duty to present a persuasive final argument and thus placing a defendant in grave peril, by itself, is not misconduct. Whether a prosecutor's argument constitutes misconduct is measured by reference to case law and the Rules of Professional Conduct. The gravity of peril is measured by the probable persuasive effect of the misconduct on the jury's decision rather than the degree of impropriety of the conduct. To preserve a claim of prosecutorial misconduct, the defendant must—at the time the alleged misconduct occurs—request an admonishment to the jury, and if further relief is desired, move for a mistrial.

*Stettler v. State*, 70 N.E.3d 874, 881-82 (Ind. Ct. App. 2017) (citations and quotation marks omitted) (quoting *Ryan*, 9 N.E.3d at 667), *trans. denied*.

[28] Where a defendant fails to request an admonishment to the jury or move for a mistrial after objecting to a prosecutor's alleged misconduct, he must demonstrate fundamental error on appeal. *Ryan*, 9 N.E.3d at 667-68. "Before prosecutorial misconduct can be found to have resulted in fundamental error, we must first determine whether misconduct has occurred." *Seide v. State*, 784 N.E.2d 974, 977 (Ind. Ct. App. 2003). In so doing, we consider the prosecutor's remarks in the context of the argument as a whole. *Id.*

[29] The deputy prosecutor's closing argument included the following assessment of Ashby's responses during Detective Slaughter's interview:

> I'm saying that [Ashby], uh, knows or-or demonstrated proficiency in this of the way not to say much of anything, but I'm doing that to show you that in this interview, he's not giving him the answer. Coming, uh, for instance, uh, after a simple "no" question that was asked by, uh, Detective Slaughter, Ashby says, "That's what, I even asked if he's done that." "If..." I, being Ashby, "I even asked if he..." Blakley, "...has done that." What's he talking about? He's talking about a burglary/robbery. And Steve, which is Blakley, says, "I got somebody that-that'll do it." Now more Ashby speak. What are we talking about? What-what is the do, and what is the it? *Since he won't tell you, I will.* Burglary and robbery. What does this mean in the context of aiding in the commission of-of the L2 burglary and the L3 robbery?

Tr. Vol. 2 at 233 (emphasis added). Ashby objected, claiming that the highlighted phrase amounted to an improper reference to his decision to assert his Fifth Amendment right not to testify. The trial court noted that it did not interpret the statement as a reference to Ashby's decision not to testify; nevertheless, the court admonished the jury to disregard the statement. Immediately thereafter, the deputy prosecutor attempted to provide context and clarification, explaining, in relevant part,

> Ladies and gentlemen, and for the last hour I have been talking exclusively about the transcript that was produced and was played in open court, uh, from State's Exhibit No. 100. The reference that-that I made then, and have made consistently, comes from this statement. In this statement, ladies and gentlemen, Dave Ashby re-report-reported, "I even asked if he's done that." Stephen … Blakley, said, "I got somebody that'll do that." Now, in this statement, he's not telling us what is the do and what is the it. I am suggesting to you by way of closing argument that that is referring to burglary and robbery at the Kelly residence. That is the plan.

*Id*. at 234-35.

[30] Ashby did not move for a mistrial. As such, he must demonstrate fundamental error. He asserts that fundamental error occurred, citing as support *Reynolds v. State*, 797 N.E.2d 864, 866 (Ind. Ct. App. 2003), and *Herron v. State*, 801 N.E.2d 761, 764 (Ind. Ct. App. 2004). A prosecutor's direct comment on the defendant's exercise of his right against self-incrimination amounts to fundamental error. *Reynolds*, 797 N.E.2d at 869-70. In *Reynolds*, the prosecutor directly referenced the defendant's decision not to testify at trial. *See Id*. at 868

("He takes the 5th Amendment. You take the 5th Amendment when you got something to be concerned about …. So in order for that to apply you have to have done something to incriminate yourself."). The *Reynolds* court held that the prosecutor's statements amounted to fundamental error. *Id*. at 869. In *Herron*, the alleged misconduct was twofold: first, during direct examination of the victim, when the prosecutor asked him what question he would like to ask the defendant, Herron objected, and the court sustained the objection; second, during closing argument, the prosecutor said, "members of the jury, right over there at that table, that's the only one in the courtroom that can certainly tell us where that gun is." 801 N.E.2d at 765. The *Herron* court held that because the prosecutor's comment could reasonably be interpreted to suggest that it was the defendant's invocation of his Fifth Amendment privilege that prevented the State from producing the weapon, it amounted to fundamental error. *Id*. at 766. We find these cases distinguishable.

[31] Here, we find that when taken in context, the deputy prosecutor's statement amounts to an isolated reference not to Ashby's decision not to testify at trial but merely to Ashby's use of the vague terms "do" and "it" during his interview with Detective Slaughter. *See* State's Ex. 100. As such, this case is more analogous to *Bryant v. State*, 41 N.E.3d 1031, 1036 (Ind. Ct. App. 2015), where another panel of this Court found that the prosecutor's comments did not explicitly refer to the defendant's decision not to testify and were, at most, a comment on an arguable weakness of one of the exhibits.

[32] Overwhelming independent evidence presented at Ashby's trial supported a reasonable inference that the terms "do" and "it" were synonymous with completing the home invasion/burglary, thus rendering any error harmless. Even if the challenged statement could be deemed an indirect implication concerning Ashby's failure to testify at trial, the trial court properly admonished the jury to disregard the statement, and the deputy prosecutor clarified that his remarks were limited to the context of Ashby's responses in his interview with Detective Slaughter. *See Johnson v. State*, 901 N.E.2d 1168, 1173 (Ind. Ct. App. 2009) ("where the trial court adequately admonishes the jury, such admonishment is presumed to cure any error that may have occurred."). Additionally, the trial court specifically instructed the jury not to consider Ashby's decision to assert his constitutional protection against self-incrimination. *See* Appellant's App. Vol. 2 at 130 (final instruction 21: "No defendant may be compelled to testify. A defendant has no obligation to testify. The Defendant did not testify. You must not consider that in any way."); *see also Weisheit v. State*, 26 N.E.3d 3, 20 (Ind. 2015) (when jury is properly instructed, we presume they followed such instruction); and *Bryant*, 41 N.E.3d at 1035 (trial court's final instructions held sufficient to cure any misconduct in prosecutor's isolated remark). Simply put, any error in the deputy prosecutor's statements was cured by his clarification as well as the trial court's admonition and final instruction. As such, we conclude that Ashby has failed to demonstrate error, let alone error so prejudicial as to make a fair trial impossible.

# Section 5 – Ashby has failed to meet his burden of demonstrating that his sentence is inappropriate in light of the nature of his offense and his character.

[33] Ashby asks that we review and revise his sentence pursuant to Indiana Appellate Rule 7(B), which states that we "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, [this] Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." When a defendant requests appellate review and revision of his sentence, we have the power to affirm or reduce the sentence. *Akard v. State*, 937 N.E.2d 811, 813 (Ind. 2010). In conducting our review, our principal role is to leaven the outliers, focusing on the length of the aggregate sentence and how it is to be served. *Bess v. State*, 58 N.E.3d 174, 175 (Ind. 2016); *Foutch v. State*, 53 N.E.3d 577, 580 (Ind. Ct. App. 2016). This allows for consideration of all aspects of the penal consequences imposed by the trial court in sentencing, i.e., whether it consists of executed time, probation, suspension, home detention, or placement in community corrections, and whether the sentences run concurrently or consecutively. *Davidson v. State*, 926 N.E.2d 1023, 1025 (Ind. 2010). We do "not look to see whether the defendant's sentence is appropriate or if another sentence might be *more* appropriate; rather, the test is whether the sentence is 'inappropriate.'" *Foutch*, 53 N.E.3d at 581 (quoting *Barker v. State*, 994 N.E.2d 306, 315 (Ind. Ct. App. 2013), *trans. denied* (2014)). The defendant bears the burden of persuading this Court that his sentence meets the inappropriateness standard. *Bowman v. State*, 51 N.E.3d 1174, 1181 (Ind. 2016).

[34] In considering the nature of Ashby's offense, "the advisory sentence is the starting point the Legislature has selected as an appropriate sentence." *Green v. State*, 65 N.E.3d 620, 637-38 (Ind. Ct. App. 2016), *trans. denied* (2017). When determining the appropriateness of a sentence that deviates from an advisory sentence, we consider whether there is anything more or less egregious about the offense as committed by the defendant that "makes it different from the typical offense accounted for by the legislature when it set the advisory sentence." *Holloway v. State*, 950 N.E.2d 803, 807 (Ind. Ct. App. 2011). Ashby was convicted of level 2 felony burglary while armed with a deadly weapon. A level 2 felony carries a sentencing range of ten to thirty years with an advisory term of seventeen and one-half years. Ind. Code § 35-50-2-4.5.

[35] In asking that we reduce his sentence to the advisory term, Ashby essentially requests that we evaluate only the nature of his role in the burglary rather than the nature of the burglary itself. In other words, he emphasizes that since he was not present at the burglary, he should not be saddled with a sentence that accounts for the use of a deadly weapon or the injury Ron suffered when Langley struck him in the head with the barrel of a firearm. He characterizes his role as simply having pitched the idea to commit the burglary and then being unaware of its actual commission. We do not believe that Ashby's role was as limited as he suggests.

[36] Ashby needed money to pay off a methamphetamine debt. He not only had the idea to target the Kellys but also drove Blakley to the Kellys' rural home to ensure that Blakley and Langley could find it and execute the burglary. He

knew that his confederates had driven to the Kellys' property a couple times but had not completed the burglary because the Kellys were not home. He understood that the Kellys needed to be present to open the safe and arcade game cash boxes for the burglar(s). This knowledge, combined with his knowledge that the Kellys had firearms in their home, underscores his awareness that the offense could be dangerous and confrontational. He was the only one of the three confederates who had knowledge concerning the specific locations within the home where the Kellys stored large sums of cash and valuables. Langley made various statements during the burglary indicating that he had been instructed as to what to take and precisely where to find cash and other valuables such as silver, firearms, and televisions. After the burglary, Ashby shared an equal one-third portion of the spoils, and when he subsequently sold some of the contraband to Sparky, he shared the proceeds with his confederates.

[37] In short, Ashby not only facilitated the crime against the Kellys but also was considered an equal partner in it from beginning to end. As such, we are unpersuaded by his claim that he should not have been sentenced based on the overall nature of the offense, which was a dangerous, confrontational home invasion that included violence on one of the victims. The nature of the offense does not militate toward reducing Ashby's sentence.

[38] Likewise, Ashby's character does not militate toward a shorter sentence. We conduct our review of his character by engaging in a broad consideration of his qualities. *Aslinger v. State*, 2 N.E.3d 84, 95 (Ind. Ct. App. 2014), *clarified on other*

*grounds on reh'g*, 11 N.E.3d 571. "When considering the character of the offender, one relevant fact is the defendant's criminal history." *Garcia v. State*, 47 N.E.3d 1249, 1251 (Ind. Ct. App. 2015), *trans. denied* (2016). The presentence investigation report shows Ashby to be a drug addict who steals to support his habit. He began consuming alcohol at age twelve and was a regular drinker for more than a decade. He began smoking marijuana at age thirteen and, in his early twenties, used marijuana and cocaine regularly. He has used methamphetamine regularly for nearly two decades and began using pain medications in his mid thirties. Since age thirty-six, the now forty-three-year-old Ashby has amassed an extensive criminal record. He admitted to crime sprees in Kentucky that resulted in twenty-four burglary convictions, for which he received concurrent ten-year sentences. He has multiple convictions for drug trafficking and possession and has been incarcerated a total of six or seven times. His record also reflects at least three probation violations and a smattering of convictions for theft, assault, illegal handgun possession, and nonsupport of a dependent. Despite his history of drug-related offenses, his only substance abuse treatment was two decades ago and comprised only thirty days. Instead of seeking help, he continued to use drugs and incur debt that has precipitated his need for quick cash and his continued cycle of criminal conduct. Ashby's lack of self-control underscores his need for structure and treatment within the constraints of the Department of Correction.

[39] The record also reflects a betrayal of trust between Ashby and the victims. As discussed, Ashby met Ron while performing community service as a

maintenance worker under Ron's supervision. Ron befriended Ashby, and the friendship progressed after Ashby was released from the halfway house. This led to invitations to the Kellys' home, where Ashby gained information concerning the locations of their valuables. He subsequently used this information to target the Kellys for burglary, and his confederates made use of the information to maximize the spoils of the burglary. Rather than merely socializing with his new friends, Ashby took note of their valuables and took advantage of their kindness. This reflects negatively on his character.

[40] Ashby claims that he never intended for Ron to get injured during the burglary. To the extent that this reflects remorse indicative of upstanding character, we note that the trial court identified Ashby's expressions of remorse as a mitigator during sentencing but sentenced him to the maximum allowable term. Trial courts are uniquely situated to observe a defendant and can best determine whether his remorse is genuine. *Phelps v. State*, 969 N.E.2d 1009, 1020 (Ind. Ct. App. 2012), *trans. denied*. We defer to the trial court in this regard, but we observe that Ashby's attempts to deflect blame belie his remorse claims. *See, e.g.*, Appellant's App. Vol. 2 at 143 (Ashby's statement to probation officer portraying Ron as "just as sinister as the defendants.").

[41] In sum, Ashby has failed to meet his burden of demonstrating that his sentence is inappropriate in light of the nature of the offense and his character. Accordingly, we affirm his sentence.

[42]    Affirmed.

Vaidik, C.J., and Mathias, J., concur.